[No. 29825. *En Banc.* December 19, 1946.]

CHARLES R. ROEDIGER *et al., Respondents,* v. C. D. CULLEN *et al., Appellants.*[1]

[1]Reported in 175 P. (2d) 669.

*Houghton, Cluck & Coughlin, Edward E. Henry* and *Teats & Teats,* for appellants.

*Bertil E. Johnson* and *Ralph M. Rogers,* for respondents.

ROBINSON, J.—Counting both husbands and wives, there are no less than thirty-four parties to this appeal. Unusually large as that number is, it is insignificant when compared to the number of persons, not parties, who have a real and vital interest in its result. Indeed, it is at least technically true that every person in the world has an interest at stake.

All of the record parties are property owners in a salt-water beach community on the southerly shore of Vashon island. The plaintiffs sought a decree in the trial court

establishing an alleged prescriptive right to use a footpath across the properties of the defendants, the path being, for the most part, located between the defendants' houses and the beach; such a path as is commonly found in such communities, having been created, at least in most instances, as in this, by neighborly usage.

█ The trial court, for reasons hereinafter noted, concluded that it was legally impossible to grant the prayer of plaintiffs' complaint directly, but, after permitting certain amendments, indirectly awarded to the plaintiffs the rights they sought by granting a right of passage to all the world; that is to say, it decreed the path to be a *public* path. There can be no question but that a public path is of the same nature as a public highway, and, as is said in 25 Am. Jur. 339, § 2: "It is the right of travel by all the world, . . . which constitutes a way a public highway."

The defendants have appealed, but the plaintiffs have not cross-appealed. We take it, then, that they have accepted the decree which the trial court entered, although it destroys the privacy of their own waterfront holdings by granting to the world in general the right to wander at will along the foreshore in front of their dwellings. It may be that the plaintiffs' geographical surroundings are such, and are likely to remain such, that this is not too great a price for them to pay for the privilege which the decree indirectly confers upon them by declaring the pathway open to use by the general public. However that may be, we may take judicial notice of the fact that there are many other waterfront communities where such paths have been created by community usage which may not be so fortunate. We have particularly in mind those waterfront communities which abut upon, or are contiguous to, our state parks. A 1945 publication of the state park committee says, of one of its waterfront parks:

"Crowds of 2,000 have been counted there on a summer's day for Illahee offers the desirable in parkdom. Soon its 13 acres will scarcely accommodate the crowds for many tourists seek the fine picnicking facilities and pleasant waters of the beach while the rapidly expanding city of

Bremerton finds in this park nearby recreation for her thousands of defense workers."

According to the records of the state park committee, the state parks are seventy-five in number and have an area of 49,644 acres. Of these parks twelve, having an area of 3,612 acres, front on salt water, and fifteen, having an area of 12,658, have fresh-water beaches.

We also have in mind those numerous private beach resorts which cater to week-end and holiday crowds. Residential waterfront communities which lie adjacent to or near resorts of that character and have footpaths, such as is involved in this action, have a vital interest in the precedent which may be established if the decree appealed from is affirmed.

There is no material conflict in the evidence. It establishes that the beach community with which we are concerned had its beginning more than forty years ago. It is, for the most part, located upon an abandoned Federal military reservation. The first occupants were merely squatters who built shacks along the waterfront, and portions of the path came into being by their visiting back and forth. In 1909, the Federal government leased the tract, or at least a large part of it, to one Bachelor, who subleased to other persons, some of whom testified at the trial.

In 1921, a Federal enactment provided for the survey and subdivision of the military tract, the subdivisions to conform, as far as practicable, to the tracts then occupied by lessees or sublessees. In this act, Bachelor's sublessees were given a preference right to purchase the premises they had occupied, as per an appraisal to be made; payments to be made in one sum or in ten annual installments. It was further provided that the secretary of the interior might sell and convey to other purchasers in case the sublessees did not exercise their preference within a period therein stated. See 42 Stat. 142. The titles of all parties in this action, except those of Cullen and Simcox, were initiated by these government deeds.

Nothing in the evidence shows the exact westerly terminus of the path, but it appears to be somewhere in the

neighborhood of the most westerly of the seventeen tracts into which the reservation land was subdivided. At all events, the Rooths are the most westerly of the plaintiffs, and there is some testimony indicating that the path splits up into branch paths somewhere in their neighborhood. From this property, it runs westerly across sixteen lots which were originally reservation lands. At its somewhat indefinite westerly beginning, the path, as indicated on the plat in evidence, is a considerable distance from the beach, at least one hundred sixty feet or more, and runs back of the houses. After crossing four lots (all the lots, as originally laid out, except one, are ten rods in width), it runs in front of the houses and follows the beach line. The last lot but one going east is the property of the defendants Huhns and Thompsons, and the last, of the defendants Cook. Crossing the Cooks' easterly line, the path enters the Simcox property, then the Cullen property, both of which were purchased from the Puget Mill Company, being a portion of a large tract of woodland it acquired many years ago. From that point, the path continues a little way along a county road to the ferry dock, from which ferries operate to the mainland.

During the period when Bachelor controlled the property, a launch was operated during the summertime on a rather indefinite schedule. This landed on the Pohl lot, which is the fourth from the east of the lots carved out of the military reservation. The existing ferry began operating in 1920, and there has been a little store in the neighborhood of the landing since 1921. Although there are other reasons for the prosecution of this action, the principal aim of the plaintiffs is to preserve an easy and convenient route to the ferry landing and store. We say an easy and convenient route because all of the plaintiffs in this action, and all other persons holding or owning lots in the community, have another route to and from the ferry, a public road. The respondents' brief describes this road with reasonable accuracy as follows:

"In 1931 or 1932 the county built a road across the property of all the parties to this action, which is known

and designated upon the map, as the Pohl road. It runs in a general easterly and westerly direction and is back some distance from the beach. At the easterly end where the road leaves the ferry it runs quite near the back of the homes of the appellants but as it proceeds to the west it goes farther and farther away from the beach and up over the hills. To use this county road requires the respondents to climb steep hills to reach the county road and then to travel over the long heavy grades of the road itself. It is a long, circuitous route and becomes longer and more difficult for the people residing further westward. Some of the respondents in this action, because of age and infirmities, are unable to use the county road to reach the ferry landing, and have been compelled to refrain from going to the grocery store and to the ferry landing as they formerly could and did do over the passage way here involved."

We may add that it appears from the plat in evidence that this county road passes through the properties of the defendant marital communities at less than sixty feet from the beach line. The road is not circuitous. It simply veers away from the beach as it proceeds westward. It crosses the lots of all the plaintiffs, and indeed of all the lot owners. By the time it reaches the Roediger property, which is in the neighborhood of the westerly terminus of the path, it is quite a way from the beach. Mr. Roediger testified that he could reach the ferry dock in about twelve minutes by following the path, but that it took him thirty-five minutes to go north on his lot and then go down the county road. However, his case is exceptional. Mr. Roediger's lot is the fifteenth of the series, counting from the east. On the eleventh lot, the road bends sharply to the north, and consequently crosses the Roediger lot at quite a distance from the beach; in fact, so far from it that it is more than fifteen hundred feet from his house to the road. At the turning point, however, the road is still less than four hundred feet from the beach line.

The plaintiffs do not contend that the path was at any time a private way of necessity, although testimony was continually elicited from their witnesses that, until the road was built, they had no other way to reach the

ferry. Throughout the trial, the plaintiffs contended that they had private easements by prescription; that is to say, by adverse use. That in itself is a negation of the concept that the path was a way of necessity.

"The use of a way of necessity is permissive, and not adverse, and hence, is not the foundation of a prescriptive right. Where a person has once obtained a way of necessity, no length of user, so long at least as the necessity continues, can have the effect to create an easement by prescription. In other words, the right of way having arisen by necessity, the possession and use thereof is always referable to that right alone, and can not be made the foundation or ground for the assertion of a higher right, and will cease when the necessity ceases." 2 Thompson on Real Property (Perm. ed.) 109, § 521.

■ Furthermore, if the path was ever a private way of necessity, it ceased to be upon the opening of the county road, even though the road, as indicated by the testimony of Mr. Roediger and several other witnesses, is a less convenient way to reach the ferry. It is said in *Waubun Beach Ass'n v. Wilson*, 274 Mich. 598, 265 N. W. 474, 103 A. L. R. 983, adopting the language of a California case:

" 'A way of necessity arises from necessity alone and continues only while the necessity exists. Unquestionably appellant had a way of necessity across his grantor's ranch until a road was dedicated to his use, but when that was done his right to a way of necessity ceased, and it matters not that the old road was more convenient for his purposes. When it ceased to be indispensable the right ceased.' [Citing cases.]"

We are satisfied that this is sound law. See cases cited in the note to the *Waubun* case in 103 A. L. R. 993.

■ Nor can it be reasonably contended that the path is a public way of necessity; for, by using the county road laid out by the county on a sixty-foot right of way, any member of the public can reach any point on the premises of every party to this action, or any point on the intervening properties of their neighbors who are not parties to this action. This is so because the county road crosses every piece of property that the path crosses. In fact, it is in

evidence that the post-office department of the United States delivers the mail to all of the members of the community by the use of the county road. Its mail carrier deposits their mail in boxes maintained by the residents of the community at the point where the road crosses their respective properties.

The specific question before us is whether the evidence warrants a finding that the path is a public path by prescription; for there is no evidence of dedication and no evidence that the public authorities ever had anything to do with its creation or have done any work in connection with its upkeep or repair or recognized it in any other way.

A more detailed statement of the evidence is required. As hereinabove stated, about 1905, or a year or two earlier, a number of squatters settled along the beach of the military lands. It would appear that at least some of them lived there permanently; for there is evidence that the Rasmussen children attended a school on the island during that period. There is evidence also that, during the leasing period, the path was used by the children of two or three families to attend school, first, a school on the island, and later, a school in Tacoma.

During the early years, there were but few permanent residents. They have increased as better transportation has become available. It is still true, however, that some of the people reside there only during the summer, and some, only on week ends. It appears that, to the westward of the defendants' properties, there are about twenty-five permanent resident families, and about twenty-five other persons who come over during the summer or for week ends at any time of the year.

Every witness called by the plaintiffs testified that he never asked, or received, permission of the defendants to cross their property or the property of anyone living in the community. This testimony was in no way rebutted. In fact, it was stipulated by the defendants that a number of other witnesses would, if called, so testify. Relying on this evidence, the respondents contend that their use of the path, without *express* permission, was necessarily adverse.

The decision in this case will largely, though not wholly, turn upon the answer to that contention.

It appears conclusively that, during the entire life of the path, those who used it united in keeping it passable. At certain points, the path frequently washed out. At at least one other point, it was necessary to construct and maintain a rough sort of bridge or walkway. The residents all had an interest in the use of the path, and all, in a neighborly manner, took part in making the necessary repairs, whether on their own property or on the property of their neighbors.

Mr. Lewis, whose property is well to the westward, lived on the military reservation as early as 1909, and has lived permanently in the community since 1927. In speaking of the walkway part of the path, which is considerably to the east of his property, he testified as follows:

"Q. How was that pathway constructed? A. It is built up like bridgework now. Q. Who built it? A. All of us together used to do everything together; everybody came in and helped. Q. How long ago has it been since you built that pathway? A. Must have been six or seven years, anyhow, since we had to refix; it used to go out every winter before that."

At another point, Mr. Lewis testified:

"Q. When you went to repair, was any request for permission—how did you go about repairing? A. All agreed on a certain Sunday to come and fix it up. Q. Mr. Lewis, has that pathway been clearly distinguishable at all times since you have been there? A. Only when a storm would take part of it out and then we would rebuild it."

Mr. Beymer, who was one of the Bachelor sublessees, testified that he worked on the path and tried to help keep it up, and when it got in bad shape, all got in together and fixed it up, "so they could travel back and forth."

Mr. Gleb, who had lived in the community since 1934, in speaking of the path where it crosses the Huhn and Thompson properties, testified as follows:

"Q. And you have helped fill in behind the bulkhead, to maintain the path? A. Yes. Q. Where the path is, a boardway or walkway, have you helped to maintain that? A. I have. Q. How frequently would you have to do that?

A. Used to fix that walk, take once a year, using the spring of the year; after the winter washouts. Couple of years we had mild weather and no high tides, we didn't have to do anything. Q. Who would do this repair work? A. The community; the members in the community."

There is other testimony indicating that the path has been maintained by the members of the community by mutual effort and for their mutual use, and it appears that it was always so until Mr. Huhn began to rearrange it. As has already been stated, there is on the Huhn and Thompson property only about sixty feet of space between the county road and the beach. We further gather from the record that there is a sudden rise or hill on this lot which makes the building space very restricted. The walk or path ran within six or eight feet of his front windows, it not being more than ten feet between his house and the bulkhead. In September, 1943, Mr. Huhn diverted the path to the rear of the Thompson house, which he was then occupying, by creating a stairway consisting of ten or eleven steps and a pathway behind the house which he continued down the gradual slope to a reconnection with the original path.

On May 18, 1944, the appellants posted a notice that, on or after May 28th, the pathway through their properties would be closed to the public. Shortly after the posting of the notice, Huhn destroyed the pathway he had constructed behind the Thompson house, and still later he began to build or rebuild a house which extended over the original path and which, as we understand the record, particularly the court's second memorandum decision, he went on and completed after the beginning of this action.

The trial court stated, in a memorandum decision handed down shortly after the trial, that it would grant the relief asked. On defendants' motion for judgment notwithstanding the memorandum decision, the court's attention was directed to the fact that the defendants had put up the barriers on May 28, 1944, and that Dr. Cook had not received the deed to his lot from the United States until September 26, 1934. On these facts, it was contended by the defendants that the necessary prescriptive period had

not run as against the Huhn property, citing an early decision of this court. After hearing argument on the motion, the court rendered a second memorandum decision which reads, in part, as follows:

"However, the court has been convinced by the showing made by the defendants, D. B. Cook, et ux, that the court cannot, as was its desire, adjudicate only the rights of the plaintiffs in this matter on the theory of a private easement, because the only easement that could be acquired over the Cook property, the United States Patent having been issued within ten years prior to the commencement of the action, was a public easement. The case of *Slaght v. Northern Pac. R. Co.*, 39 Wash. 576, 81 Pac. 1062, seems to be decisive on that question.

"As was indicated in the original memorandum opinion, the court was prepared to hold, if necessary, that the easement in question was a public easement, and it now does so.

"The defendants will therefore be restrained from interfering with the right of the public to use the pathway referred to in these proceedings, as it was established by public use from 1909 (and earlier) to June, 1940.

"This presents certain practical problems for the defendants which the court has sought to avoid, inasmuch as the house of one defendant has been constructed directly over what the court holds was a public pathway and the corner of another defendant's house impinges upon it if it does not entirely obstruct it. If this were a private easement the court is of the opinion that another pathway might be substituted by the acquiescence of all the parties concerned, as was done in *N. W. Cities Gas Co. v. Western Fuel Co., supra,* but a substituted public way could not be approved or accepted by certain users thereof short of use for the statutory period. Some approval by the proper public authorities of the substitution would seemingly be required.

"If the pathway in question is a public way, and the court so holds, the defendants have acquired no rights by erecting their buildings on it."

The opinion then discusses the question as to whether Huhn might maintain his house on the path, on the theory of equitable estoppel, and, after expressing doubts as to the applicability of that principle, further said:

"In any event, the doctrine could not be applied in this action in which there is no equitable estoppel pleaded *and in which the public is not represented.*" (Italics ours.)

We agree that the public was not represented; yet the court entered a decree granting the public an easement over the defendants' lands. We further agree that, under the rule laid down in the *Slaght* case, *supra,* the plaintiffs could not be awarded private easements over the Cook property; but we do not agree that the *Slaght* case holds, as stated in the memorandum opinion, that a public easement could be granted under the facts shown.

It is the general rule that the old common law of prescriptive rights has been superseded in those states which have statutes of limitation concerning adverse possession. That is the rule in this state. In *Northwest Cities Gas Co. v. Western Fuel Co.,* 13 Wn. (2d) 75, 123 P. (2d) 771, decided in 1942 in an *En Banc* decision in which all members of the court concurred, it is said:

"An easement of right of way across the land of another, including even the establishment of a public highway over private property, may be acquired by prescription. [Citing cases.]

"The period required in this state to establish such a prescriptive right of way is ten years, by analogy to the provisions of Rem. Rev. Stat., § 156 [P. C. § 8161], which is the statute of limitations relative to actions for the recovery of real property. [Citing cases.]"

It is said in *Stofferan v. Okanogan County,* 76 Wash. 265, 273, 136 Pac. 484, citing cases from 16, 21, and 37, Washington Reports:

"In this state, however, we have repeatedly held that roads may be established by prescription by the use by the public for a period of not less than seven years, where the same have been worked and kept up at the expense of the public, as provided in Rem. & Bal. Code, § 5657 (P.C. 441 § 91); or, where not so kept up at the public expense, simply by continued use by the public for a period co-extensive with the period of limitation for quieting title to land, which is, in this state, ten years."

We start, then, with the proposition that, under the law of this state, to establish a prescriptive right, a plaintiff is necessarily compelled to invoke, and the court must necessarily apply, our ten-year statute of limitations.

In *Slaght v. Northern Pac. R. Co., supra,* the plaintiff brought suit to recover possession from the railway of a strip of land occupied by its tracks. The summons was served on the railway company October 9, 1901. It was found as a fact that the railway and its predecessor in interest had actually held the right of way openly, notoriously, and adversely for more than the statutory prescriptive period, ten years. But it was also found as a fact that Slaght did not receive his patent from the United States until April 20, 1897, less than seven years before he began his action. This court held that, even though the railway was using the land in the performance of the public service of transporting passengers and freight, it had not shown the ten years' adverse user required by our statute, since, during the first three years of the ten required, the land was a part of the public domain, and while this was the case, the railway could not establish a legally adverse use as against the United States by reliance upon our state statute of limitations. In arriving at that conclusion, this court discussed a number of decisions of other courts. We quote from one or two of these cases.

In *Gibson v. Chouteau,* 80 U. S. (13 Wall.) 92, 20 L. Ed. 534, it is said:

"But neither in a separate suit in a Federal court, nor in an answer to an action of ejectment in a State court, can the mere occupation of the demanded premises by plaintiffs or defendants, for the period prescribed by the statute of limitations of the State, be held to constitute a sufficient equity in their favor to control the legal title subsequently conveyed to others by the patent of the United States, without trenching upon the power of Congress in the disposition of the public lands. *That power cannot be defeated or obstructed by any occupation of the premises before the issue of the patent, under State legislation, in whatever form or tribunal such occupation be asserted.*" (Italics ours.)

Following that decision, the supreme court of Missouri, in *McIlhinney v. Ficke,* 61 Mo. 329, said, in part:

"Although our statute of limitations begins to run from the date of the right of entry, yet as the legal title remained in the United States after the entry and up to the date of

the patent, our statute of limitations had no effect as a bar, because it interfered with the primary disposal of the soil."

The opinion in the *Slaght* case also cites *Redfield v. Parks,* 132 U. S. 239, 33 L. Ed. 327, 10 S. Ct. 83. In speaking of the rule which we are now discussing, the supreme court of the United States said:

"The foundation of this rule is the proposition that time does not run against the government, that no statute of limitation affects the rights of the government, unless there is an express provision to that effect in the statute, *and even then it cannot be conceded that state legislation can in this manner imperil the rights of the United States or overcome the general principle that it is not amenable to the statute of limitations or the doctrine of laches.* The facts found in the present case leave it beyond question that the legal title to the property in controversy was in the United States until the issuing of the patent to the railroad company." (Italics ours.)

This case was tried in January, 1945. On April 7th, the plaintiffs' motion that the complaint be amended to conform to the proof was granted, the defendants requesting and receiving an exception. On June 15th, the court held, in a memorandum decision, that it would grant the prayer of the complaint. Defendants moved for judgment notwithstanding the memorandum decision, and, after hearing argument, the court rendered a second memorandum decision and subsequently entered the decree in accordance therewith.

The second memorandum decision held that the plaintiffs were entitled to have the path declared a public path; that is, the court not only completely changed the whole theory of the action, but the prayer for relief also; for if any plaintiff at any time advanced the theory that he was seeking a right as a member of the public, or prayed for a decree declaring the path a public path, it is not shown in the record before us. Apparently, however, the court did not purport to substitute the public for the plaintiffs in the action; for, toward the close of the decision, it stated that certain things could not be done because "the public is not represented."

In the second memorandum decision, the court said:

"However, the court has been convinced by the showing made by the defendants, D. B. Cook, et ux, that the court cannot, as was its desire, adjudicate only the rights of the plaintiffs in this matter on the theory of a private easement, because the only easement that could be acquired over the Cook property, the United States Patent having been issued within ten years prior to the commencement of the action, was a public easement. The case of *Slaght v. Northern Pac. R. Co.,* 39 Wash. 576, 81 Pac. 1062, seems to be decisive on that question."

We agree with this holding to the extent that the *Slaght* case is decisive on the question as to whether or not the plaintiffs could be granted private easements across the Cook property; but we do not agree that it holds in any way whatever that a public easement could be granted to the public. In fact, every principle upon which the court relied in the *Slaght* case is to the contrary.

As has been already shown, our statute of limitations must be invoked to establish either a private or a public easement, and the statute will not run against the United States.

It has occurred to us that the trial court may have had in mind certain of our early decisions with respect to a Federal statute which reads as follows:

"The right of way for the construction of highways over public lands, not reserved for public uses, is hereby granted." Rev. Stat., § 2477; 43 U.S.C.A., § 932.

This statute has been in existence and unchanged since 1866. In *Okanogan County v. Cheetham,* 37 Wash. 682, 690, 80 Pac. 262, 70 L. R. A. 1027, the court said, in construing the statute:

"In the case at bar, the general public having used this highway for a period of seven years before respondent entered the land as a homesteader, we think such user constituted an acceptance of the grant made by Congress in § 2477. We do not think there was a necessity of said user existing for a period of ten years. *It is not a matter of prescription, but of acceptance of a grant.* Under the authorities cited, and many others bearing upon the same question, there can be little question about this grant having been one

*in praesenti.* The resolution adopted by the board of county commissioners we do not think essential to an acceptance. *The public had already accepted by actual, continuous user."* (Italics ours.)

Under that theory, a public easement over the Cook property could be declared in this case. However, that theory was expressly held unsound in the case of *McAllister v. Okanogan County,* 51 Wash. 647, 100 Pac. 146, 24 L. R. A. (N.S.) 764. In *Stofferan v. Okanogan County, supra,* the court was earnestly urged to overrule the *McAllister* case and return to the holding in the *Cheetham* case, but refused to do so. The decree in the instant case, in so far as the Cook property is concerned, cannot be sustained by reliance upon § 2477 of the Revised Statutes.

We are of the opinion that the trial court could not escape the difficulty presented by the *Slaght* case by declaring that the public had acquired an easement over the Cook property. That could not be done without holding that prescriptive rights may be acquired against the United States by adverse public use for the period required by our state statute of limitations. It is said in *Lundberg v. University of Notre Dame,* 231 Wis. 187, 282 N. W. 70, 285 N. W. 839, a case in which it was sought to establish a *public* easement: "There could have been no adverse possession or adverse user prior to 1889 when the patent was issued."

And so it must be said in this case that there could have been no adverse user of the Cook land until the patent was issued to Cook on September 26, 1934, since,

" . . . in the absence of enabling statutes, no prescriptive rights can be acquired against the United States; and where land is owned by the United States, adverse user of an easement over such land cannot begin until the title has passed to a private grantee." 28 C. J. S. 643, § 9.

The foregoing discussion, of course, applies only to the Cook property. As to the other properties involved, we must broaden the field of inquiry.

We revert to the case of *Northwest Cities Gas Co. v. Western Fuel Co.,* 13 Wn. (2d) 75, 123 P. (2d) 771, and quote

therefrom certain fundamental propositions, omitting, however, the supporting citations. We use the index numbers as they appear in the opinion. Propositions 1 and 2 have already been quoted.

"[3] Prescriptive rights, however, are not favored in the law, since they necessarily work corresponding losses or forfeitures of the rights of other persons.

"[4] When one enters into the possession of another's property there is a presumption that he does so with the true owner's permission and in subordination to the latter's title.

"[5] A user which is permissive in its inception cannot ripen into a prescriptive right, no matter how long it may continue, unless there has been a distinct and positive assertion by the dominant owner of a right hostile to the owner of the servient estate.

"[6] It is therefore essential that all of the elements necessary to constitute a permanent valid claim by adverse user amounting to a prescriptive right be shown to be present. See the cases and texts cited in the last three preceding numerical subdivisions.

"[7] The question of adverse user is a question of fact. While there are no easement cases in this state expressly announcing this rule, we have a number of cases which do apply it in reference to adverse possession, and the rule would seem equally applicable to the issue of adverse user in easement cases.

"[8] The burden of proving a prescriptive right rests upon the one who is to be benefited by the establishment of such right.

"[9] To establish a prescriptive right of way over the land of another person, the claimant of such right must prove that his use of the other's land has been open, notorious, continuous, uninterrupted, over a uniform route, adverse to the owner of the land sought to be subjected, and with the knowledge of such owner at a time when he was able in law to assert and enforce his rights."

These propositions, having been indorsed by all of the nine members of the court at the time that case was decided, are binding upon us, and we may add that the wide research undertaken in the instant case has confirmed our belief that they faithfully reflect the law as declared by the majority of the American courts. We further think that they apply

when the easement sought is public or private. If there be any distinction, it would seem that propositions 3 and 4 should be applied even more strictly when a public easement is sought, since, in most instances, a public easement is the more onerous.

■ Of the foregoing numbered propositions, it is with numbers 9 and 6 that we are chiefly concerned. To establish a prescriptive right of way, the claimant must prove that his use "has been open, notorious, continuous, uninterrupted, over a uniform route, adverse to the owner of the land," and all of these elements must be shown to be present.

The evidence in this case establishes without question that the user relied on was open, notorious, continuous, and uninterrupted, and although the route was changed at some points from time to time, we agree with the trial court that, to all reasonable intents and purposes, the route was uniform. But we do not agree that the plaintiffs met the burden of proving that the usage was adverse.

■ As hereinabove stated, there is a great deal of wholly unrebutted evidence that no user ever asked his fellow lot owners for permission to cross their lots, and it is contended that this evidence conclusively establishes that the user was adverse. There is also a complete lack of evidence that any lot owner ever objected to the user by his neighboring lot owners until May 18, 1944. The respondents' contention that, since the plaintiffs had no express permission to cross the defendants' property, it necessarily follows that the user was adverse, completely disregards the well-established rule that permissive use may be implied. This rule, it is true, has been chiefly applied in cases involving uninclosed lands, but it is applicable to any situation where it is reasonable to infer that the use was permitted by neighborly sufferance or acquiescence.

It is said in a California case, *Clarke v. Clarke,* 133 Cal. 667, 66 Pac. 10:

"The fact that the owner knew of the travel and occasional use of the property does not even raise a presumption that such use was hostile or under claim of right. If any party who is allowed by silent permission to pass over the

lands of another, nothing being said as to any right being claimed, after five years, without showing that he ever communicated such claim in any way to the owner, can thus gain title by prescription, it would be a blot upon the law. *An owner could not allow his neighbor to pass and repass over a trail upon his open, uninclosed land without danger of having an adverse title successfully set up against him.* If he had several neighbors who so used the land, several separate titles to rights of way might thus be acquired. The law will presume that the land belongs to the owner of the paper title, and that the use was by permission or silent acquiesence." (Italics ours.)

It is said in another California case, *Thomas v. England,* 71 Cal. 456, 12 Pac. 491, decided in 1886:

"To perfect an easement by occupancy for five years, the enjoyment must be *adverse, continuous, open, peaceable.*

"It must be *adverse,* and under claim of a legal right so to do, and not by the consent, permission, or indulgence merely of the owner of the alleged servient estate.

*"This is quite obvious in cases where the consent, permission, or license is expressly given.*

*"But it is no less true where the permission or license is implied, as it may well be from the facts and circumstances under which the use was enjoyed. (Bradley Fish Co. v. Dudley,* 37 Conn. 136.)

"The question is one for the jury, or for a court sitting as such, to determine as a fact in the light of the relations between the parties and all the surrounding circumstances. *(Putnam v. Bowker,* 11 Cush. 542.)" (Italics ours.)

It is said in *Tarpey v. Veith,* 22 Cal. App. 289, 134 Pac. 367:

"A right of way by prescription may be acquired over the lands of another only by user which is neither expressly nor tacitly permissive. . . . That is to say, user alone is not sufficient to establish a prescriptive right of way over the lands of another."

It is said in *Howard v. Wright,* 38 Nev. 25, 143 Pac. 1184:

' "A right of way by prescription can only be acquired by a user which is neither expressly nor impliedly licensed or permissive. It must be adverse and hostile to the owner of the servient estate, and must be under a claim of right so expressed as to charge the owner of the servient estate with knowledge thereof. . . .

"Nothing less than an adverse user, under claim of legal right, will perfect an easement by occupancy for the statutory time. A use acquired merely by consent, permission, or indulgence of the owner of the servient estate can never ripen into a prescriptive right, unless the user of the dominant estate expressly abandons and denies his right under license or permission, and openly declares his right to be adverse to the owner of the servient estate. (*Hurt v. Adams,* 86 Mo. App. 73) . . .

"*The rule that precludes a permissive use from ripening into a right to continued enjoyment, where the permission, consent, or license is expressly given is no less effective where the permission or license may be implied. (Thomas v. England,* 71 Cal. 456, 12 Pac. 491.)" (Italics ours.)

And again, in *Weaver v. Pitts,* 191 N. C. 747, 133 S. E. 2, it is said:

"The law should, and does encourage acts of neighborly courtesy; a landowner *who quietly acquiesces* in the use of a path, or road, across his uncultivated land, resulting in no injury to him, but in great convenience to his neighbor, ought not to be held to have thereby lost his rights. It is only when the use of the path or road is clearly adverse to the owner of the land, and not an enjoyment of neighborly courtesy, that the land owner is called upon 'to go to law' to protect his rights." (Italics ours.)

It is unnecessary to cite further cases to the point that, in the absence of express permission, permissive use may be implied, in view of our own recent decision in *State ex rel. Shorett v. Blue Ridge Club,* 22 Wn. (2d) 487, 156 P. (2d) 667. That action was brought for the purpose of establishing a public easement across certain of appellant's lands. It is admitted that such an easement could be established by ten years' adverse public user. We quote briefly from the opinion:

"No one on behalf of the owners of any of the property ever objected to people crossing there, . . . permission was neither sought nor affirmatively expressed."

These are the exact facts established by the plaintiffs in the instant case. Yet, the court held:

"That the use in the case at bar was presumed to be permissive at inception, is substantiated by the character of

710

the property and the fact that the public use of it did not in any way interfere with the owner's use."

In dealing with the fact that the owners of the property never made any objection until shortly before the bringing of the action, which is also a fact in the matter before us, the court said:

"An owner is not required to adopt a dog-in-the-manger attitude in order to protect his title to his property. The law which pertains to acquisition of prescriptive right, as claimed by respondents in the case at bar, by a presumed grant, should not, in view of the fact that it would result in the encumbrance of another's property, be extended so as to work that result through mere neighborly courtesy by a land owner."

It is firmly established in the law that long-continued use of the lands of another, without express permission, does not in and of itself establish a prescriptive right. The user must be adverse, and, as said in *Northwest Cities Gas Co. v. Western Fuel Co., supra,* "The question of adverse user is a question of fact." The surrounding circumstances may give rise to an inference that the usage is in fact not adverse, but permissive. In the *Blue Ridge Club* case, the chief circumstance inducing that inference was the character of the lands involved. They were uninclosed.

It is pointed out by appellants that the lands of Cullen and Simcox were, before they acquired them, portions of a great tract of uninclosed timberland owned by the Puget Mill Company. Simcox got his deed in 1941. Cullen has, or at the time of the trial had, only a contract interest in his property. The required ten years would, therefore, have to be made up as to both by tacking. We gravely doubt whether the proof establishes an easement, either public or private, as against the former owner, Puget Mill Company. In fact, we suspect that all the properties involved in this case are uninclosed. At all events, we find no evidence concerning any fences or barriers between the lot owners, although we cannot be certain as to that. We think we may safely assume that, if there are such barriers, none of them extended across the path in question. If it be true that the

lands are uninclosed, the presumption is that the use was permissive, and, therefore, that no easement was acquired. But on account of the uncertainty above mentioned, we will not decide the case on that theory.

Under a heading, "Way by prescription when use is permissive only," it is said in 2 Thompson on Real Property (Perm. ed.) 106, § 521:

"The modern tendency is to restrict the right of one to acquire a prescriptive right of way whereby another, through a mere neighborly act, may be deprived of his property by its becoming vested in the one whom he favored. Thus, where persons traveled the private road of a neighbor in conjunction with such neighbor and other persons, nothing further appearing, the law presumes such use was permissive, and the burden is on the party asserting a prescriptive right to show that his use was under claim of right and adverse to the owner of the land. When the use of a way has begun by permission it is presumed so to continue as respects the question of prescription. Although the acquisition of a way by prescription does not preclude the use by the servient owner or by the public, it does require a use as of right and not by favor or permission, and no prescriptive right arises if the use originated in amity and continued in recognition of the owner's title. If the use of a way over one's land be shown to be permissive only, no right to use it is conferred though the use may have continued for a century, or any length of time. 'A different doctrine would have a tendency to destroy all neighborhood accommodation in the way of travel; for if it were once understood that a man, by allowing his neighbor to pass through his farm without objection over the passway which he used himself, would thereby, after the lapse of twenty or thirty years, confer a right on him to require the passway to be kept open for his benefit and enjoyment, a prohibition against all such travel would immediately ensue.' "

The final sentence of the above quotation is credited, as the footnotes show, to *Hall v. McLeod*, 2 Met. (59 Ky.) 98, 74 Am. Dec. 400. It appears in that case as a quotation from Jones on Easements, § 282. It has been quoted as such in the decisions of many courts, including our own. It is quoted, and relied on, in *Scheller v. Pierce County*, 55 Wash. 298, 301, 104 Pac. 277, and also in *Schulenbarger v. Johnstone*,

*infra.* In the *Scheller* case, the quotation from Jones on Easements, § 282, is of greater length and includes, in addition to what is quoted by Thompson, the following:

" 'If the use of a way over one's land is shown to be permissive only, no right to use it is conferred, though the use may have continued for a century or any length of time. ". . . To create the presumption' of a grant of a right of way, the circumstances attending its use must be such as to make it appear that it was established for the benefit of the claimant, or that its use was accompanied by a claim of right, or by such acts as manifested an intention to enjoy it, without regard to the wishes of the owner of the land. The use must have been enjoyed under such circumstances as will indicate that it has been claimed as a right, and has not been regarded by the parties merely as a privilege revocable at the pleasure of the owner of the soil." ' Jones, Easements, § 282."

The *Scheller* and *Schulenbarger* opinions have been widely cited in opinions handed down in other jurisdictions, as well as in our own reports, the *Scheller* case having been relied upon as authority as late as 1945 in *State ex rel. Shorett v. Blue Ridge Club, supra.* The *Schulenbarger* case was quoted from in *Leinweber v. Gallaugher,* 2 Wn. (2d) 388, 390, 98 P. (2d) 311, decided in 1940, as follows:

"Of the character of user both by the appellants and their predecessors in interest, what was observed in *Schulenbarger v. Johnstone,* 64 Wash. 202, 116 Pac. 843, 35 L. R. A. (N. S.) 941, may well be said:

" '. . . we see no more than the usual accommodation between neighbors that marked the settlement of the public domain. Until roads are lawfully established, as said by one of the witnesses, "they [meaning the public] must go somewhere," and by common consent the pioneer settling in front of another has usually been willing that his neighbor should continue his way over the land occupied by him. To charge the owner with acquiescence, or to credit the user with an adverse intent, would put a penalty upon generosity, and consequently, . . . destroy all neighborhood accommodation.' "

In the instant case, we see no more than the usual accommodation between neighbors which marked the settlement of the public domain. In fact, every square foot of

the lands with which we are concerned, other than the lands of Cullen and Simcox, were a part of a Federal reservation as late as 1921, and some of the lots remained a part of the reservation until more than ten years thereafter, one at least as late as 1934.

The settling of these lands was in every real respect a "pioneer settling." The settlement began in 1902. There were no public roads during the squatter period nor during the leasing period; in fact, none until 1931 or 1932. It seems to us that it is an inevitable inference that these settlers traveled back and forth across each other's premises by common consent and acquiescence.

Let it be supposed that A, B, C, and D settled on adjoining lots. If Mrs. A crossed the intervening lots of B and C to borrow a cup of sugar from Mrs. D, are we to infer that she thereby began the establishment of an adverse prescriptive right because B and C did not object to her crossing? Did the children who lived on the westerly tracts gain prescriptive rights across the easterly tracts for themselves or the public because the owners of those tracts did not bar their passage, knowing full well that they had no other way to get to school and realizing that their traversing the woodland path did no harm whatever to their property?

It is unnecessary to labor this point. It is obvious that to have lived along that beach would have been unbearable, if not impossible, but for such neighborly accommodations. The physical situation was in fact such that some of the lot owners would have been imprisoned on their own lots at high tide but for such neighborly permissive use. Now, at least, they have independent access and egress by the county road.

In our opinion, the use of the pathway arose out of mutual neighborly acquiescence; that is to say, it was permissive in its inception, a mere mutual privilege or license the benefits of which extended to the residents, and, of course, to their tenants and their visitors.

In *Schulenbarger v. Johnstone, supra,* we adopted the

following rule from a Missouri case, and it was also made the rule of decision in the recent *Blue Ridge Club* opinion:

"'If permissive in its inception, then such permissive character being stamped on the use at the outset, will continue of the same nature, and no adverse user can arise until a distinct and positive assertion of a right hostile to the owner, and brought home to him, can transform a subordinate and friendly holding into one of an opposite nature, and exclusive and independent in its character.'"

There is no evidence to the effect that any lot owner ever made a positive assertion to the defendants or to any other lot owner that he claimed to use the path as of right until the defendants put up the notice on May 18, 1944. As far as the evidence goes, such a right was first asserted in the complaint in this action.

For the foregoing reasons, we hold that the plaintiffs showed no adverse user, and it would seem to follow that the decree appealed from must be reversed. We know of no theory upon which, having held that their user as individuals was permissive, we can say that their user as members of the public was adverse.

 Plaintiffs offered no evidence tending to prove public use, which is natural enough, since the suit was not brought on that theory. In fact, the plaintiffs objected to that sort of evidence as immaterial. The defendant, Dr. Cook, testified, in part, as follows:

"Q. Did the public generally use that pathway that the plaintiffs have been talking about? A. The neighbors used it. Q. The neighbors used it? Anybody else use it? A. Well, occasionally, yes, but not like they do at the present time. Q. What has happened recently? MR. JOHNSON: It is immaterial, if the Court please, so far as what the other public use might have been is concerned. It seems to me it is immaterial who uses it. THE COURT: The Court is interested in knowing to what extent this has been and is being used. You may inquire. I am not certain as to its materiality, but we will sift that out later. A. At the time we went over there, there was only a small portion of the families that are listed on that list now, lived there any time of the year, and ferries was running very irregular. Now, the ferries run every hour. We have, as Mr. Simcox testified, or Mr. Cullen,

come down there from the ferries; and one morning we had, sitting out on the front porch eating breakfast, and a drunk walked up on our front porch. And some other time—I have a garden right next to the path,—and tore up the garden and threw it out in the Bay. It is just those irritations that, constantly from the general public, not particularly the neighbors. We have always gotten along very friendly with the neighbors, and had no objection to their walking. Q. You remember when the path was shut off, the date, Dr. Cook? A. May 28th. Q. What year? A. 1944. *Notice stating that the path would be closed, says closed to the public; doesn't say to the neighbors; says to the public.*" (Italics ours.)

The defendant, Huhn, testified, in part, as follows:

"Q. So, as I understand your testimony,—the objection, by the way, that you had to this road is because people walked in front of your house, wasn't it? A. Yes. Q. That has been your whole objection to it, hasn't it Chuck? A. Well, that and the increase that there has been. In other words, we live so close to the ferry dock, we supply all the houses out there, have been increasing and increasing continually since 1929 when I moved out there. Q. You mean you object to the people who live west of you walking across this path? A. Not my old friends, no. Q. Well, do you object to some of the people who live up in that direction walking across your path? A. Well, people I don't know, yes. Q. Well, I mean people who own property up there? A. No, the old property owners, I don't. Q. Or to the people they may rent their property to? A. Well, occasionally they do become objectionable, yes. Q. That is the reason for your objection? A. That and the relative closeness to which they pass my Bay window."

The above testimony, with the exception of some other to the same general effect given by defendant, Cullen, is all the evidence in the record as to public use—using the word "public" as referring to others than the plaintiffs. It is evident that this usage has been of recent date only, and it accordingly furnishes no basis for a finding of ten years' user. Portions of the above-quoted testimony, however, leave us not without hope that this controversy can be

settled without too great inconvenience to any of the parties thereto.

The judgment and decree from which this appeal is taken is reversed, and the cause dismissed.

ALL CONCUR.

