**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| TALBOTT MILLER and LINDA MAXSON, a married couple; DWIGHT SANDLIN and JUDY SANDLIN, a married couple, | No. 87133-1-I DIVISION ONE UNPUBLISHED OPINION |
| Respondents, | |
| v. | |
| CRAIG CONNORS and KAREN CONNORS, a married couple, Defendants, | |
| and | |
| RICHARD CARTMELL and JANE CARTMELL, a married couple, | |
| Appellants. | |

FELDMAN, J. — Richard and Jane Cartmell appeal the trial court's decision, following a five-day bench trial and site visit, in which it concluded that Dwight and Judy Sandlin, Talbott Miller, and Linda Maxson (collectively Respondents) had established a prescriptive easement over a portion of their property. Finding no error, we affirm.

I

This appeal focuses on the lawful use of a portion of a driveway on Bainbridge Island that is owned by the Cartmells.  It is referred to herein as the "Disputed Property" and is highlighted below:



The driveway provides several properties access to Wing Point Way NE to the north and Donald Place to the south.  Only some of the properties that use the

driveway are involved in this appeal. As noted, the Cartmells own the Disputed Property. To the east of the Cartmell property is the "Rucker Short Plat," which is divided into four lots.[1] Dwight and Judy Sandlin and Talbott "Toby" Miller and Linda Maxson (the Miller/Maxons) own Lots 2 and 4 of the Rucker Short Plat, respectively, and use the driveway.

The section of the driveway at issue is the Cartmells' 7.96-foot-wide western half of the "panhandle" portion of the driveway that connects to Wing Point Way NE. The 7.96-foot-wide eastern half of the driveway is owned by Craig and Karen Connors and is not at issue in this appeal.[2] No party disputes that Respondents (or their predecessors-in-interest) have used the driveway for decades. Nor do the Cartmells dispute that the Connors, the owners of Lots 1 and 3 of the Rucker Short Plat, lawfully use the Disputed Property.[3] The issue on appeal is solely whether Respondents have established a prescriptive easement over the Disputed Property.

The Cartmells have lived at their property since 1994. The Sandlins purchased Lot 2 (pictured above) in 1996 and used the entire width of the driveway since that time without asking for or receiving permission to do so. The first dispute regarding the use of the driveway occurred when the Sandlins first met the Cartmells at a "neighborhood meeting" in 2004, called by the Cartmells and the Connors to discuss unauthorized use of the driveway, where the Cartmells told the Sandlins they did not have the right to use the Disputed Property. The Sandlins

---

[1] The Rucker Short Plat is labeled as the "Winslow Short Plat" on the map above.
[2] There is an undisputed express easement burdening the Connors' property which allows Respondents to use the eastern portion of the driveway.
[3] The basis for this lawful use is unknown.

disagreed, asserted they had the legal right to use the entire width of the driveway, left the meeting early in anger, and continued using the entire driveway after the meeting.

Sometime between 2006 and 2008, a second incident occurred between the Cartmells and the owners of Lot 4 at the time, Michelle McCrackin and Dan Seaver (the McCrackin/Seavers). The Cartmells and Connors attempted to block the McCrackin/Seavers from accessing the Disputed Property by "repeatedly" placing tape across the driveway. After the McCrackin/Seavers continued to drive through the tape and use the driveway to access Wing Point Way NE, the Cartmells confronted them and told them they wanted the McCrackin/Seavers to exclusively access their property from Donald Place to the south. The McCrackin/Seavers ignored the Cartmells' request and continued to use the driveway to access Wing Point Way NE.

The Miller/Maxsons purchased Lot 4 from the McCrackin/Seavers in 2017. A third incident as to the driveway occurred in 2020. The Cartmells, together with the Connors, sought to limit traffic on the driveway and installed a gate across it. A few months later, the Cartmells again indicated Respondents had no right to use the Disputed Property and locked their half of the gate to prevent its use. In response, the Miller/Maxsons filed a lawsuit against the Cartmells to quiet title to an easement over the Disputed Property. The Sandlins intervened and asserted similar claims.

Following a five-day trial and site visit, the trial court concluded there was a prescriptive easement over the Disputed Property and enjoined the Cartmells from

locking their side of the gate.  The Cartmells appealed to Division Two, which transferred the matter to us for resolution.

II

The Cartmells argue the trial court erred in concluding that Respondents have established a prescriptive easement over the Disputed Property.  We disagree.

A

To establish a prescriptive easement, a claimant must show use of the other person's land

> for a period of 10 years in a manner that was (1) "open" and "notorious," (2) "continuous" or "uninterrupted," (3) over "a uniform route," (4) "adverse" to the landowner, and (5) "with the knowledge of such owner at a time when he was able in law to assert and enforce his rights."

*Tiller v. Lackey*, 6 Wn. App. 2d 470, 484, 431 P.3d 524 (2018) (quoting *Gamboa v. Clark*, 183 Wn.2d 38, 43, 348 P.3d 1214 (2015)).

The claimant bears the burden of proving the elements of a prescriptive easement.  *Nw. Cities Gas Co. v. W. Fuel Co.*, 13 Wn.2d 75, 84, 123 P.2d 771 (1942).  Whether a claimant has established those elements is a mixed question of law and fact.  *Petersen v. Port of Seattle,* 94 Wn.2d 479, 485, 618 P.2d 67 (1980).  "A trial court's factual findings will be upheld if supported by the record; the court's conclusion that the facts, as found, constitute a prescriptive easement is reviewed for errors of law."  *Lee v. Lozier*, 88 Wn. App. 176, 181, 945 P.2d 214 (1997).

The only element in dispute in this appeal is whether Respondents' use of the Disputed Property was "adverse."  "We generally interpret adverse use as

meaning that the land use was without the landowner's permission." *Gamboa*, 183 Wn.2d at 44. Our Supreme Court presumes in certain circumstances "that when someone enters onto another's land, the person 'does so with the true owner's permission and in subordination to the latter's title.'" *Id.* (quoting *Nw. Cities,* 13 Wn.2d at 84). Potentially relevant here, the presumption applies in "enclosed or developed land cases in which 'it is reasonable to infer that the use was permitted by neighborly sufferance or acquiescence.'" *Id.* (quoting *Roediger v. Cullen*, 26 Wn.2d 690, 707, 175 P.2d 669 (1946)).

There is a "low bar" for finding a reasonable inference of neighborly sufferance or acquiescence, such as "'persons travel[ing] the private road of a neighbor in conjunction with such neighbor and other persons, nothing further appearing.'" *Gamboa*, 183 Wn.2d at 51 (citing *Roediger*, 26 Wn.2d at 711; quoting 2 GEORGE W. THOMPSON, COMMENTARIES ON THE MODERN LAW OF REAL PROPERTY § 521, at 106 (perm. ed. 1939)). The presumption of permissive use applies in this circumstance based on public policy considerations: a "landowner *who quietly acquiesces* in the use of a path, or road, across his uncultivated land, resulting in no injury to him, but in great convenience to his neighbor, ought not to be held to have thereby lost his rights." *Gamboa*, 183 Wn.2d at 48 (quoting *Roediger*, 26 Wn.2d at 709). Claimants seeking to overcome a presumption of permissive use arising out of neighborly acquiescence must show they "distinctly and positively assert[ed] a claim of right" to access the property. *Gamboa*, 183 Wn.2d at 45-46.

B

Contrary to the Cartmells' argument, the trial court did not err in concluding the "presumption [of permissive use] in *Gamboa* does not apply under the circumstances of this case" because the Cartmells were not "merely tolerating or passively accepting the use of the other owner." As stated above, the presumption applies to the landowner who "*quietly acquiesces*" to the use of their land. It applies when neighbors jointly use a road *without incident*s, "*nothing further appearing*." *Gamboa* and cases following it that applied the presumption of permissive use are characterized by the absence of disputes as to the use of the property leading up to the single event that precipitated the parties' litigation. *See Gamboa*, 183 Wn.2d at 41 (applying the presumption where "[e]ach party was aware of the other's use of the roadway, but no one objected to the other's use until a dispute arose in 2008"); *Tiller*, 6 Wn. App. 2d at 486-87 ("[A]ll used Lakeview Street for their own purposes and in conjunction with each other without incident until the instant dispute arose. Accordingly, the trial court properly applied a presumption of permissive use under *Gamboa*.").

In contrast to the cases applying the presumption, the testimony at trial indicated the Cartmells did not "quietly acquiesce" to Respondents' usage. To the contrary, there were multiple disputes between the Cartmells and others over the driveway and thus no reason to fill an evidentiary gap with a presumption of permissive use. Specifically, Judy Sandlin testified that when the Cartmells and the Connors called a "neighborhood meeting" about the driveway, chaired by Richard Cartmell, the meeting was "contentious" and that it was "called . . . to tell us that we . . . didn't have rights to use [the Cartmells'] side of the easement."

Dwight Sandlin testified Richard Cartmell said "no one in the meeting had easement rights on his property." Dwight responded, "We have easement rights to Wing Point Way per our title documents" and testified at trial, "[I] definitely took exception to [Cartmell's statement], because it sounds -- well, the only way -- in that context, he was saying we didn't have access to Wing Point because we crossed his property."[4] He understood Cartmell to be "telling [him] not to . . . use the driveway."

Judy further testified, "From his tone, demeanor, I believe what [Cartmell] was saying is we could no longer use his portion [of the driveway]." She continued:

> [I]t got to the point where we felt we were being threatened. Our home was being threatened, our access to our home was being threatened, and we left without munchies. And if you knew us, you know, that's probably very rare.
>
> Q. Did you stay at the meeting to discuss any of these issues?
>
> A. It wasn't being discussed. It was being dictated. There was not even an opportunity to ask questions. There was no free exchange. It was like they had a prearranged agenda that Mr. Cartmell and Mr. Connors had worked out.

The Sandlins left the meeting early "in anger" and continued using the driveway despite being told they had no right to do so. Although Cartmell testified that later in the meeting he gave all property owners permission to use the driveway, the trial court found, "[t]he testimony of the Sandlins was credible that they were the first to leave the meeting and there was no credible evidence to dispute this statement. When they left the meeting, they believed that Mr. Cartmell was denying them access to his portion of the panhandle driveway."

---

[4] We refer to married individuals who share a last name by their first names when necessary for clarity.

Other evidence similarly shows the Cartmells did not "quietly acquiesce" to use of the Disputed Property by others. As noted above, sometime between 2006 and 2008, another incident occurred between the Cartmells the McCrackin/Seaver owners. McCrackin explained the Cartmells tried to block her access to the panhandle driveway to the north "repeatedly":

> We came home one night -- they never talked to us about it ahead of time or anything, but we just came home one night, and there was that barrier tape put across so, we couldn't access our driveway. And so, we looked around. We thought maybe if something was wrong, maybe there was a problem in the road, but we didn't see anything. So, we just took it down and drove into our driveway.

> And then they did it -- because they repeated it several times, putting up more tape and more tape, so they would block off more. And finally, they kind of confronted us and were saying, you know, 'This is going to be better for you. It's really better if we change this, and you guys come in from the other direction [Donald Place].' We said, 'Well, you know, our mailbox is up there [Wing Point Way NE]. This is the way we always drive down. So, no, this is our driveway.' So, we declined to change our access.

McCrackin also testified, "I cannot tell you how long it went on, but it did go on for a while."

Richard Cartmell likewise testified "[t]here was something across the driveway" that was intended to "establish where the property lines and easements were on [the Connors] property" and that when McCrackin came upon them for the first time "she became very upset and pulled out and even broke one of the survey poles, threw them aside. And her husband had to calm her down and take her into the house." He added that the purpose of the markings was to "explain the layout on the ground of the easements and property lines to [McCrackin and Seaver]." No one disputes that McCrackin and Seaver nevertheless continued

using the driveway. Based on such evidence indicating the Cartmells did not "quietly acquiesce" to the use of the Disputed Property, the trial court did not err in concluding the presumption of permissive use does not apply here.

C

But even if the trial court should have applied the presumption of permissive use, all that Respondents are required to show to overcome the presumption and establish adverse use in a prescriptive easement claim is that they "distinctly and positively assert[ed] a claim of right" to access the property to establish adverse use in their prescriptive easement claim. *See Gamboa*, 183 Wn.2d at 45-46. They made that showing here. "Possession is adverse if a claimant uses property as if it were his own, entirely disregards the claims of others, asks permission from nobody, and uses the property under a claim of right." *Lee*, 88 Wn. App. at 182. As the trial court concluded, the adverse use element was proven as to the Miller/Maxsons because their predecessors-in-interest "encountered material blocking their access to Wing Point Way (they drove through it on multiple occasions), and even after being told by Mr. Cartmell that they should access their property using Donald Place they continued to use the Wing Point Way driveway as true owners would."

As to the Sandlins, the trial court concluded the adverse use element was proven "by their continued use after the 2004 meeting." The court explained:

> At this meeting, Richard Cartmell told the Sandlins that they did not have an easement on his portion of the panhandle. Mr. Sandlin disagreed and told Mr. Cartmell that they had a right to travel the panhandle driveway. Mr. Cartmell then indicated that later in the meeting he gave everyone his permission, but from the testimony presented there was nothing to support that the Sandlin's were

- 10 -

> aware of this change of heart: Yet, despite thinking that Mr. Cartmell felt that they had no right to use his portion of the driveway, the evidence clearly showed that the Sandlin's continued to use the panhandled driveway through the present day.

As discussed above, Respondents disregarded the Cartmells' requests to exclusively use Donald Place, never asked for permission to use Disputed Property to access Wing Point Way NE, and verbally asserted their right to use it when confronted by the Cartmells. Substantial evidence supports the trial court's determination that Respondents established the element of adverse use.

The Cartmells' reliance on *Imrie v. Kelley*, 160 Wn. App. 1, 250 P.3d 1045 (2010), is misplaced. The court in *Imrie* concluded a neighbor's use of a road was permissive because the owners of the road were aware of the neighbors' use and never disputed that use until the instant case arose. *Id*. at 10. Importantly in *Imrie*, "the findings fail[ed] to establish that . . . . Mr. Imrie acted in a manner demonstrating a right to use the property without regard to the wishes of the owner. Consequently, the findings here do not support adverse use, but, instead, support an inference of neighborly accommodation." *Id.* Unlike *Imrie*, the record here shows that the Cartmells made clear their directive that Respondents refrain from using the Disputed Property, and despite a formal meeting, conversations, and barriers to that effect, Respondents positively asserted their right to do so by their words and actions, continuing to use it and disregarding the owner's directive.

III

In short, substantial evidence supports the trial court's adverse use determination. Because no other elements of the prescriptive easement claim are disputed, we affirm the trial court's determination that Respondents have established a prescriptive easement over the Disputed Property and its corresponding order enjoining the Cartmells from locking their gate across the Disputed Property. Having so ruled, we need not address the trial court's rulings and the parties' arguments regarding whether the easement was established on alternative grounds.

AFFIRMED

Feldman, J.

WE CONCUR:

Chung, J.         Smith, J.