277 P.3d 62 (2012)
MHM & F, LLC, a Washington limited liability company, Respondent,
v.
Edward PRYOR, Jr., and Jane Doe Pryor, Jr., husband and wife, and their marital community, Appellants.
No. 66027-6-I.
Court of Appeals of Washington, Division 1.
May 21, 2012.
*63 Dan Young, Seattle, WA, for Appellants.
Jerome Cronk, Shoreline, WA, for Respondent.

OPINION PUBLISHED IN PART
LAU, J.
¶ 1 This case involves a hold-over mobile home park tenant evicted under the Manufactured/Mobile Home Landlord-Tenant Act (Act) (ch. 59.20 RCW) for his refusal to pay rent on his mobile home space. He challenges the trial court's exercise of subject matter jurisdiction and its written findings of fact and conclusions of law. Because the court had subject matter jurisdiction, substantial evidence supports the findings, and the findings support the conclusions of law, we affirm entry of the order for writ of restitution and judgment for unlawful detainer and award attorney fees to Manufactured Homes Management & Financial Co. LLC (LLC) under RAP 18.1.

FACTS[1]
¶ 2 The record shows the following facts. Edwin Wellington (Ed) owned Thunderbird Mobile Home Park (park), which contained 65 mobile home lots. Park tenants rented or owned the mobile homes on a particular lot. With the help of his attorney, Ed set up a co-op regarding possession of the lots. To accomplish this, he conveyed the park ownership to Thunderbird Estates Mobile Home Association (Association), a mutual corporation organized under Washington law, in exchange for shares in the Association.[2] Ed then formed a company, Manufactured Homes Management & Financial Co. Inc. (MHM & F) and transferred the shares to that company. MHM & F sold shares in the Association to tenants. Tenants who purchased shares were required to sign three documents. Each tenant signed a stock purchase agreement outlining the purchase price and extended payment terms for 100 shares of stock in the Association.[3] The purchaser's obligations were secured by a pledge and trust agreement whereby the 100 shares of stock were pledged to a trustee with power to sell the stock upon default. Tenants also signed a 99-year renewable proprietary lease with the Association, permitting them to use a particular lot in the park. Tenants paid "rent" to the Association, which consisted of each tenant's pro rata share of the park's maintenance expenses.
*64 ¶ 3 In October 1982, Pryor Senior purchased from MHM & F 100 shares of stock in the Association for $22,995.00 pursuant to a written stock purchase agreement. The shares related to space 65 in the park. After a $1,500.00 down payment and a $3,000.00 discount, the balance to finance was $18,495.00, payable in 360 equal monthly installments of $190.24 beginning December 1, 1982.
¶ 4 Pryor Senior also signed a pledge and trust agreement and a proprietary lease relating to space 65. The pledge and trust agreement named Dempcy & Braley PS as trustee and pledged Pryor Senior's shares in the Association to the trustee, to be returned to Pryor Senior upon full payment. The agreement specified that all installments on the stock purchase should be paid "to Seller (MHM[ & F])." Ex. 2, at 1. The agreement also provided that in the event of a default under the stock purchase agreement, "Trustee may foreclose the pledge by selling the capital stock at public or private sale, with or without notice . . . ." Ex. 2, at 3. The proprietary lease named Pryor Senior as the lessee and the Association as the lessor of space 65. The lease provided for rent to be paid to the "[Association] or its managing agent."[4] Ex. 3, at 5.
¶ 5 Pryor Junior lived in Pryor Senior's mobile home on space 65 until Pryor Senior died in September 2003. Pryor Junior continued to occupy space 65 after his father's death and made payments pursuant to the stock purchase and sale agreement and the proprietary lease.
¶ 6 Ed Wellington's brother, Wilie Wellington, commenced working for MHM & F in 2005 or 2006. He worked side by side with Ed, handling the company's books and day to day operations. He was later named trustee under the pledge and trust agreement.[5] According to Wilie, at that time MHM & F was "doing business as" a company of Ed's.[6]
¶ 7 Pryor Junior periodically failed to timely pay the monthly stock payments. A default notice dated June 19, 2006, alleged he failed to pay the May 2006 installment. Another default notice dated September 12, 2006, alleged he failed to pay the August and September 2006 installments. Ed informed Pryor Junior in late September 2006 that the stock associated with space 65 had been sold at private sale due to Pryor Junior's payment default. But in October 2006, Wilie informed Pryor Junior that "[w]e backed off. . . because your second bounced check was honored on [its] second submission."[7] In November 2006, Pryor Junior wrote to Ed asking if he "would be interested in buying my place back at the price of $25,000." Ex. 10. According to Wilie, he was not aware if Ed responded.
¶ 8 On May 15, 2007, "Manufactured Homes Management & Financial Co. by Wilie Wellington" sent another notice of default and breach of the stock purchase agreement to Pryor Junior. Ex. 13, 14. It alleged, "The Estate of Edward Pryor" owed $467two installments of $191 each,[8] two late charges of $5 each, and $75 cost of service. This notice provided:
[I]f the above stated breach is not cured within ten (10) days since the date of this notice the Trustee shall commence foreclosure of the pledge of your shares of capital stock in [the Association] and the trustee shall thereafter proceed to foreclose the pledge by selling the capital stock at public or private sale without further notice to you. . . .
Ex. 13. Pryor Junior received the notice on May 25. On May 29, the Association demanded *65 unpaid "maintenance charges" of $538.01.
¶ 9 Acting as trustee under the pledge and trust agreement, Wilie sold the shares associated with lot 65 to Ed, d/b/a MHM & F for $11,447.27 on May 30, 2007. This amount represented the balance owed under the stock purchase agreement. On May 31, Pryor Junior sent a $400 check to MHM & F, which was returned to him. A June 12, 2007 letter "To the Estate of Edward Pryor" from Ed notified Pryor Junior that "the stock has been sold at a private sale" and directed him to "make arrangements to [submit] for a credit report and if approved you must sign a lease, which is at the rate of $485.00 per month, or vacate the lot." Ex. 19. Several payments Pryor Junior attempted to tender after that time were rejected because "his interest as a purchaser had been foreclosed." Report of Proceedings (RP) (Aug. 10, 2010) at 50-51.
¶ 10 In July 2007, Wilie, as the "authorized agent of [the Association]," sent Pryor Junior a notice of termination of lease. Ex. 23. The Association and MHM & F jointly filed an unlawful detainer action on October 30, 2007. In March 2008, following a one-day bench trial, the trial court granted Pryor Junior's motion to dismiss without prejudice[9] the unlawful detainer action after the case in chief on lack of subject matter jurisdiction grounds. The court also entered findings of fact and conclusions of law, including findings regarding the status of the parties and a conclusion that Pryor Junior was "a tenant of the Park subject to provisions of the Mobile Home Landlord-Tenant Act, Chapter 59.20 RCW."[10] Ex. 26, at 4. It awarded $12,702.50 attorney fees and costs to Pryor Junior as the prevailing party under the Act. MHM & F did not appeal this judgment.
¶ 11 Ed Wellington died on January 31, 2009. His son, Jonathon Wellington, served as copersonal representative of his estate. In May 2009, Jonathon formed a limited liability companyMHM & F LLCand transferred MHM & F's interests in pledge agreements and lots at the park to the LLC.
¶ 12 In January 2010, "Jonathon Wellington for MHM & F, LLC" sent Pryor Junior a letter stating, "As you may know, in the case in Snohomish County Superior Court involving Thunderbird, Ed Wellington, and you, Judge Bowden recently made findings in the case holding that you were a tenant of the Thunderbird Mobile Home Park." Ex. 27, at 1, 2. The letter alleged Pryor Junior owed $467.00 in "back rent" for periods prior to May 2007 and had paid nothing since then. "That is a period of 33 months (from April, 2007, through January, 2010) and adds up to a total of $6,744.92 in unpaid rent." Ex 27, at 1. The letter offered Pryor Junior a one-year lease, including a provision for "payment of monthly rent that continues the current monthly rent of $190.24 per month for the next three months" and then increased to $560.00 per month beginning May 1, 2010. Ex. 27, at 1. Pryor Junior refused to accept the lease contract and failed to pay any money to the LLC.
¶ 13 On February 11, 2010, Jonathon Wellington as "Managing Member" of "MHM & F, LLC, Lessor/Landlord" served Pryor Junior with a five-day notice to pay rent or vacate. It alleged that Pryor Junior owed rent for April 2007 through January 2010, plus late charges and a $75 service of notice fee, for a total of $6,770.[11] Ex. 28, at 1. When Pryor Junior failed to pay, the LLC filed an unlawful detainer action in March 2010. In April 2010, Pryor Junior moved to Florida, leaving his mobile home on space 65.
¶ 14 After a bench trial in August 2010, the court determined that the May 2007 stock foreclosure sale was valid, Pryor Junior was a tenant of the LLC subject to the Act, and the requirements for unlawful detainer were satisfied. The court issued a writ of restitution *66 in favor of the LLC and a judgment for attorney fees of $29,782.50, costs of $235.00, and unpaid rent of $7419.36, set off against Pryor Junior's previous judgment for attorney fees ($13,683.86 with accrued interest) obtained in the first lawsuit. Pryor Junior appeals.

Subject Matter Jurisdiction (Assignment of Error 1)[12]
¶ 15 Pryor Junior challenges the judgment on two grounds he failed to raise below. First, he claims that a summons served in a case governed by the Act (ch. 59.20 RCW) is subject to a particular requirement for summonses served in cases governed by the Residential Landlord Tenant Act (ch. 59.18 RCW). Specifically, RCW 59.18.365 provides that a summons must contain a street address for service of the notice of appearance or answer and, if available, a facsimile number for the plaintiff or the plaintiff's attorney. The summons served on Pryor Junior contained no facsimile number for the LLC or its attorney. Second, he claims that the Association should have been named as a party because it was declared a necessary party in a previous decision that he contends must be given collateral estoppel effect.[13]
¶ 16 Ordinarily, arguments not raised in the trial court will not be considered on appeal. RAP 2.5(a). To overcome this problem, Pryor Junior contends that failing to include the facsimile number in the summons and failing to join a necessary party deprived the court of subject matter jurisdiction to hear the action. We reject this contention, following Housing Authority of City of Seattle v. Bin, 163 Wash.App. 367, 373-78, 260 P.3d 900 (2011).
¶ 17 Whether a court has subject matter jurisdiction is a question of law reviewed de novo. Dougherty v. Dep't of Labor & Indus., 150 Wash.2d 310, 314, 76 P.3d 1183 (2003). "A judgment entered by a court that lacks subject matter jurisdiction is void." Cole v. Harveyland, LLC, 163 Wash.App. 199, 205, 258 P.3d 70 (2011). The trial court's lack of subject matter jurisdiction may be raised for the first time on appeal. RAP 2.5(a)(1); In re Marriage of Scanlon, 110 Wash.App. 682, 685, 42 P.3d 447 (2002).
¶ 18 We recognize our previous decisions support Prior Junior's argument that a properly worded summons is necessary to "confer" subject matter jurisdiction upon a superior court. See, e.g., Truly v. Heuft, 138 Wash.App. 913, 918-23, 158 P.3d 1276 (2007). We also acknowledge a previous decision holding that a superior court lacks subject matter jurisdiction in an unlawful detainer action where a necessary party is not joined as a party. Laffranchi v. Lim, 146 Wash. App. 376, 383-84, 190 P.3d 97 (2008). By characterizing these issues as jurisdictional, Truly and Laffranchi permit them to be raised for the first time on appeal. But those cases are incorrectly reasoned on that point. Those cases did not consider article IV, section 6 of our constitution.
¶ 19 In recent cases where our appellate courts have considered the constitutional grant of subject matter jurisdiction to the superior courts, they have accorded it the centrality that it deserves. Our Supreme Court has held that article IV, section 6 is dispositive and has overruled precedents that erroneously classify the superior court's jurisdiction as statutory. See State v. Posey, 174 Wash.2d 131, 272 P.3d 840, 842-45 (2012); ZDI Gaming, Inc. v. State ex rel. Washington State Gambling Comm'n, 173 Wash.2d 608, 616-18, 268 P.3d 929 (2012); Williams v. Leone & Keeble, Inc., 171 Wash.2d 726, 730, 734, 254 P.3d 818 (2011); Dougherty v. Dep't of Labor & Indus., 150 Wash.2d 310, 316-20, 76 P.3d 1183 (2003); Young v. Clark, 149 Wash.2d 130, 133-34, 65 P.3d 1192 (2003); Shoop v. Kittitas County, 149 Wash.2d 29, 38, 65 P.3d 1194 (2003); Marley v. Dep't of Labor & Indus., 125 Wash.2d 533, 541, 886 P.2d 189 (1994). Truly and Laffranchi exemplify the problem *67 identified by our Supreme Court in Marley, where the court observed that the improvident and inconsistent use of the term "subject matter jurisdiction" has caused it to be confused with a court's authority to rule in a particular manner. Marley, 125 Wash.2d at 539, 886 P.2d 189.
¶ 20 Whether the superior court ruled correctly or incorrectly in this particular case, it did not lack subject matter jurisdiction. The court's subject matter jurisdiction in cases involving the title or possession of real property is expressly granted by the state constitution and has not been "vested exclusively in some other court." WASH. CONST. art. IV, sec. 6. We narrowly construe exceptions to the constitution's jurisdictional grant. Cole v. Harveyland, LLC, 163 Wash. App. 199, 206, 258 P.3d 70, (2011). Thus, it is incorrect to say that the court acquires subject matter jurisdiction from an action taken by a party or that it loses subject matter jurisdiction as the result of a party's failure to act. Bin, 163 Wash.App. at 376, 260 P.3d 900.
¶ 21 If the type of controversy is within the superior court's subject matter jurisdiction, as it is here, "`then all other defects or errors go to something other than subject matter jurisdiction.'" Marley, 125 Wash.2d at 539, 886 P.2d 189 (quoting ROBERT J. MARTINEAU, Subject Matter Jurisdiction as a New Issue on Appeal: Reining in an Unruly Horse, 1988 B.Y.U. L.REV. 1, 28. Here, the alleged errors go to statutory interpretation (Does an applicable statute require that the summons refer to a facsimile number, and if so, does the absence of such a reference require that the action be dismissed?) and to matters of procedure (Was the Association a necessary party, and if so, could the case proceed in its absence?). Pryor Junior could have litigated these issues in the trial court, but he failed to do so. Because the trial court's subject matter jurisdiction did not depend on the wording of the summons or the joinder of parties, Pryor Junior may not assert lack of subject matter jurisdiction as an excuse for avoiding his responsibility to preserve error. These are issues on which the trial court was not asked to make a ruling, and we decline to address them.[14]
¶ 22 Because the trial court had subject matter jurisdiction and substantial evidence supports its findings and the findings support its conclusions, we affirm entry of the order for writ of restitution and judgment for unlawful detainer.
¶ 23 The remainder of this opinion has no precedential value. Therefore, it will not be published but has been filed for public record. See RCW 2.06.040; CAR 14.
WE CONCUR: SCHINDLER and BECKER, JJ.
NOTES
[1] For clarity we refer to appellant as "Pryor Junior" and his father (the original stock purchaser) as "Pryor Senior." We also refer to Wellington family members by their first names.
[2] Ed's brother, Wilie Wellington, testified at trial that the Association was a "co-op" that owned the land in the park. He stated, "The tenants own shares of the association, and, subsequently, rent their space from the association, with a 99-year lease as renewable." Report of Proceedings (RP) (Aug. 10, 2010) at 21.
[3] Some tenants, however, occupied spaces in the park but were not shareholders in the Association. Those tenants made rent payments to the LLC, the successor to MHM & F. See RP (Aug. 10, 2010) at 125-26.
[4] According to the proprietary lease, "rent" is defined as certain cash requirements of the lessor associated with park operation and maintenance expenses. Ex. 3, at 1-2.
[5] While the original trustee was Dempcy & Braley PS, it withdrew after some time.
[6] Wilie's reference to "d/b/a" is based on Ed's status as the company's founder, majority shareholder, and president.
[7] Regarding this transaction, Wilie Wellington testified at the second trial, "We undid [the sale of the shares.]" RP (Aug. 10, 2010) at 33.
[8] At some point the parties began rounding the $190.24 payment up to $191.00. The amount is referred to variously in the record as $190.00, $190.24, or $191.00.
[9] The court dismissed the Association's claims with prejudice because Pryor Junior cured his default in rent payments to the Association six days before trial.
[10] These findings and conclusions were entered in January 2010. A number of factors contributed to the nearly two-year delay.
[11] As of July 26, 2010, Pryor Junior also owed the Association $3584.17 in unpaid maintenance payments.
[12] On February 13, 2012, the LLC moved to supplement its designation of Clerk's Papers to include a document entitled "Note for Trial & Stipulation for Early Trial Date." Given our resolution here, we need not address the LLC's motion.
[13] We note that Pryor Junior's brief later argues inconsistently with his jurisdiction claim that the previous decision should not be given collateral estoppel effect.
[14] For the reasons discussed above, we also reject Pryor Junior's argument that the superior court lacked jurisdiction because the LLC lacked a statutory basis for its action under the Residential Landlord-Tenant Act, chapter 59.18 RCW, the Manufactured/Mobile Home Landlord-Tenant Act, chapter 59.20 RCW, or the general unlawful detainer statutes, chapter 59.12 RCW.