IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| DAVID TILLER and THUY TILLER, husband and wife, | ) ) ) | No. 76620-1-I |
| Respondents/ Cross-Appellants, | ) ) ) | DIVISION ONE |
| v. | ) ) ) | |
| STEVEN LACKEY and SALLY LACKEY, husband and wife; and CASEY O'KEEFE and KAREN O'KEEFE, husband and wife, | ) ) ) ) ) ) | PUBLISHED OPINION FILED: December 10, 2018 |
| Appellants/ Cross-Respondents. | ) ) ) | |

SMITH, J. — Steven and Sally Lackey and Casey and Karen O'Keefe (collectively Lackey) appeal the trial court order awarding their neighbors David and Thuy Tiller (collectively Tiller) a prescriptive easement over a section of a private road owned by Lackey and others. Lackey argues the trial court lacked subject matter jurisdiction over the dispute and erred by concluding the requirements of a prescriptive easement had been satisfied. Tiller argues the trial court erred by refusing to recognize an easement by necessity over the road. We hold that the court had subject matter jurisdiction and that the trial court erred by concluding the requirements of a prescriptive easement were satisfied but the requirements of an implied easement by necessity were not. We conclude the

trial court's findings support recognizing an implied easement by necessity. We remand to the trial court for entry of revised conclusions of law consistent with this opinion and a revised judgment that specifies the easement is an implied easement rather than a prescriptive easement.

## FACTS

In June 1945, Noel and Eileen Provanche recorded the Plat of Georgia Point (plat), which the Provanches created from part of a larger parcel of property they owned on the north end of Lake Whatcom. The plat consisted of 10 contiguous waterfront lots, with lot 1 at the west end of the plat and lot 10 at the east end. The plat also included an additional parcel (street parcel), which was dedicated as a "private street reserved for the use of the owners of the Lots within the boundaries of [the] plat," solely for street purposes. The owner of each lot within the plat holds an undivided one-tenth interest in the street parcel, which consists of a 30-foot-wide strip of land that abuts the northern boundaries of lots 1 through 10. The street parcel spans the entire width of the plat, so that its western end extends west to, and is flush with, the western boundary of lot 1, and its eastern end extends east to, and is flush with, the eastern boundary of lot 10. When the plat was recorded, an active railroad right-of-way separated the northern boundary of the street parcel from North Shore Road, the main road along that part of Lake Whatcom.

Appellants Steven and Sally Lackey now own lot 10 (the easternmost lot) of the plat. Appellants Casey and Karen O'Keefe own lot 9.

In July 1949, the Provanches "carved out" and sold a piece of property

2

(cabin lot) from their remaining property to the east of the plat. The cabin lot is not contiguous to the plat, and the Provanches retained ownership of the land separating the plat from the cabin lot. A ravine and seasonal stream separated the cabin lot from the Provanches' remaining property to the east of the cabin lot, and there is no evidence that the cabin lot has ever been accessed from the east.

When the Provanches sold the cabin lot, they granted and recorded an easement (cabin lot easement) across the property they retained between the plat and the cabin lot. This property is now owned by David and Thuy Tiller and is referred to herein as the "Tiller lot." The cabin lot easement burdened the Tiller lot in favor of the cabin lot "for road purposes" for access to the cabin lot. The original cabin lot easement abutted the street parcel to the west at the eastern boundary of the plat and mirrored the street parcel's 30 foot width and its path. In other words, the original cabin lot easement, if drawn on a map, appears as a continuation of the street parcel from the eastern boundary of lot 10, across the Tiller lot, to the western boundary of the cabin lot. In 1959, the width of the cabin lot easement was reduced from its original 30 feet to 12 feet as the result of a lawsuit between the then-owners of the Tiller lot and the cabin lot.

By 1947, a railroad crossing from North Shore Road to the plat (crossing) had been installed at approximately the boundary between lots 8 and 9. The extent of road installation within the street parcel at that time is unclear. However, there is evidence that by 1950, a road (Lakeview Street) had been installed within the street parcel. From the south end of the crossing, Lakeview

Street branched off both west, toward lot 1, and east, toward lots 9 and 10 and the cabin lot. Figure 1 below depicts, for illustrative purposes, the plat (including the street parcel), the railroad right-of-way, North Shore Road, the Tiller lot, the cabin lot, and the cabin lot easement.[1] Figure 1 also depicts the approximate location of the crossing, as well as another railroad crossing to the east that was used to access the Provanches' remaining property to the east of the cabin lot.



*Figure 1*

By 1976, the railroad right-of-way had been abandoned, and in August 1976, the then-owners of the lots within the plat purchased the right-of-way that

---

[1] Figure 1 is not part of the record and is included only for illustrative purposes. It is based on exhibit 181, which was admitted at trial for illustrative purposes.

had separated the street parcel from North Shore Road. The then-owners of the cabin lot and the Tiller lot did the same. Over time, some lot owners within the plat have installed crossings from their lots directly to North Shore Road across this abandoned railroad right-of-way. However, up until the time that Tiller purchased the Tiller lot in 2004, together with the portion of the abandoned railroad right-of-way between the Tiller lot from North Shore Road, the only vehicular access to the Tiller lot and the cabin lot was via Lakeview Street.

At some point before selling the Tiller lot to Tiller, Tiller's immediate predecessors opened a path directly to North Shore Road from the Tiller lot, but it was not passable for an ordinary vehicle, nor was it ever formally approved by the county or used as a primary access to the Tiller lot. After acquiring the Tiller lot in 2004, Tiller continued using the crossing and Lakeview Street to access the Tiller lot from North Shore Road.

In July 2014, Lackey notified Tiller that Lackey intended to terminate Tiller's use of Lakeview Street. Tiller filed a quiet title action on July 25, 2014, claiming a prescriptive easement to continue using Lakeview Street to access the Tiller lot. Tiller later amended the complaint to add claims for easement implied by prior use and easement implied from necessity.

At trial, multiple witnesses who once lived in or around the plat testified that Lakeview Street was the only route ever used to access the Tiller lot and the cabin lot from North Shore Road. Witnesses also testified that they were not aware of any owners of those lots ever asking, or needing to ask, permission to use Lakeview Street to access the Tiller lot or the cabin lot. Connie Myrhe, who

lived on lot 9 from 1963 to approximately 1989, testified that permission was "just assumed." Karen Walter, who once lived on the Tiller lot, testified that she did not recall ever having any discussion in the neighborhood about a need to obtain permission to use Lakeview Street, saying, "[N]obody cared. It was just the way it was." Another witness testified about the direct access to North Shore Road that had been installed by Tiller's immediate predecessors, stating that he did not believe even his four-wheel-drive pickup would be able to drive that access to the bottom (south) portion of the Tiller lot. This witness also testified that the grade from the abandoned railroad right-of-way portion of the property to the bottom portion of the Tiller lot is fairly steep.

David Tiller testified that when he and his wife purchased the Tiller lot, they initially planned to develop direct access from North Shore Road to the bottom portion of the property, where they planned to construct a new residence. But they later abandoned that plan due to impracticality resulting from the steepness of the slope, as well as a 2007 lawsuit by the owners of the cabin lot to keep the cabin lot easement open. Tiller later constructed a garage on the former railroad right-of-way portion of the property with direct access to North Shore Road. But access to the lower part of the Tiller lot remained via the crossing and Lakeview Street.

The trial court entered extensive findings of fact and conclusions of law. The court concluded that Tiller had established a prescriptive easement for ingress and egress via Lakeview Street to the western boundary of the Tiller lot, but that the requirements of an implied easement had not been met. Lackey

6

appeals. Tiller cross appeals.

ANALYSIS

I. Subject Matter Jurisdiction

Whether a court has subject matter jurisdiction is a question of law reviewed de novo. Dougherty v. Dep't of Labor & Indus., 150 Wn.2d 310, 314, 76 P.3d 1183 (2003). The trial court's lack of subject matter jurisdiction may be raised for the first time on appeal. RAP 2.5(a)(1).

Lackey asserts that Tiller's failure to follow the plat amendment procedures set forth in RCW 58.17.215 and then to appeal any adverse determination under Washington's Land Use Petition Act, chapter 36.70C RCW, deprived the court of subject matter jurisdiction. We disagree.

Subject matter jurisdiction over cases involving the title to or possession of real property is expressly granted by the state constitution and has not been "vested exclusively in some other court." WASH. CONST. art. IV, § 6. Accordingly, the trial court had subject matter jurisdiction over this dispute.

Because the trial court had subject matter jurisdiction, Lackey's argument that Tiller should have followed statutory plat amendment procedures fails. See MHM&F, LLC v. Pryor, 168 Wn. App. 451, 460, 277 P.3d 62 (2012) (where superior court's subject matter jurisdiction is granted by the constitution, "it is incorrect to say that the court acquires subject matter jurisdiction from an action taken by a party or that it loses subject matter jurisdiction as the result of a party's failure to act"); Hous. Auth. v. Bin, 163 Wn. App. 367, 376, 260 P.3d 900 (2011) ("[I]mprecise use of the term 'subject matter jurisdiction' should be

7

avoided because to misclassify an issue as 'jurisdictional' transforms it into one that may be raised belatedly and opens the way to making judgments vulnerable to delayed attack.").

Whether RCW 58.17.215 required Tiller to submit an application to Whatcom County to impose a prescriptive easement within the plat is a nonjurisdictional issue that Lackey could have raised below. Accordingly, we decline to address this issue on appeal. See RAP 2.5(a) ("The appellate court may refuse to review any claim of error which was not raised in the trial court."). We also decline to consider the alternative argument that Tiller's claim for a prescriptive easement fails to state facts on which relief can be granted. Lackey did not provide specific argument on this point, and "[p]assing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration." Holland v. City of Tacoma, 90 Wn. App. 533, 538, 954 P.2d 290 (1998) (citing State v. Johnson, 119 Wn.2d 167, 171, 829 P.2d 1082 (1992)); see also RAP 10.3(a)(6).

II. Prescriptive Easement

Lackey asserts that the trial court erred by concluding that Tiller established the elements of a prescriptive easement. We agree.

"'Prescriptive rights . . . are not favored in the law, since they necessarily work corresponding losses or forfeitures of the rights of other persons.'" Gamboa v. Clark, 183 Wn.2d 38, 43, 348 P.3d 1214 (2015) (alteration in original) (quoting Nw. Cities Gas Co. v. W. Fuel Co., 13 Wn.2d 75, 83, 123 P.2d 771 (1942)). To establish a prescriptive easement, the person claiming the easement must use

8

another person's land for a period of 10 years in a manner that was: (1) "'open'" and "'notorious'"; (2) "'continuous'" or "'uninterrupted'"; (3) over "'a uniform route'"; (4) "'adverse'" to the landowner; and (5) "'with the knowledge of such owner at a time when he was able in law to assert and enforce his rights.'" Gamboa, 183 Wn.2d at 43 (quoting Nw. Cities, 13 Wn.2d at 83, 85). Whether a claimant has established a prescriptive easement is a mixed question of law and fact. Id. at 43-44 (citing Petersen v. Port of Seattle, 94 Wn.2d 479, 485, 618 P.2d 67 (1980)). We review the trial court's findings of fact following a bench trial to determine whether they are supported by substantial evidence, and we then review whether those findings support the trial court's conclusions of law. Hegwine v. Longview Fibre Co., 132 Wn. App. 546, 555, 132 P.3d 789 (2006) (citing Keever & Assocs. v. Randall, 129 Wn. App. 733, 737, 119 P.3d 926 (2005)), aff'd, 162 Wn.2d 340, 172 P.3d 688 (2007).

Here, the only issues in dispute are whether Tiller's use of Lakeview Street was "adverse" and whether that adverse use continued over the required period of 10 years.

"Adverse use" generally means that the claimant's use was not permissive. Gamboa, 183 Wn.2d at 44. Whether use is adverse "is to be measured by an objective standard; that is, by the objectively observable acts of the user and the rightful owner." Dunbar v. Heinrich, 95 Wn.2d 20, 27, 622 P.2d 812 (1980); see also Chaplin v. Sanders, 100 Wn.2d 853, 861, 676 P.2d 431 (1984) ("The nature of [the claimant's] possession will be determined solely on the basis of the manner in which he treats the property. His subjective belief

9

regarding his true interest in the land . . . is irrelevant."). In evaluating whether use was adverse versus permissive, a presumption of permissive use applies in certain factual scenarios, including cases involving vacant and unenclosed land, and developed land cases when there is "a reasonable inference of neighborly sufferance or acquiescence." Gamboa, 183 Wn.2d at 44, 50-51.

*(A) The trial court properly applied a presumption of permissive use*

Lackey argues that the trial court erred by not addressing whether to apply a presumption of permissive use under Gamboa, in which our Supreme Court clarified the presumptions applicable in prescriptive easement cases. But the trial court did address this presumption, writing that, under Gamboa, "if there is a reasonable inference of neighborly sufferance or acquiescence, then the presumption of permissive use arises, *and that presumption applies in this case.*" (Emphasis added.) Tiller argues that the trial court erred by applying this presumption. Specifically, Tiller contends that the trial court's finding of a reasonable inference of neighborly sufferance or acquiescence was not supported by the evidence.[2] For the reasons set forth below, we conclude that the trial court properly applied a presumption of permissive use under Gamboa.

In Gamboa, the Gamboas and the Clarks owned adjoining parcels of land separated by a gravel road. Gamboa, 183 Wn.2d at 40. Since 1992, when the Gamboas purchased their parcel, the Gamboas and the Clarks each used the

---

[2] Tiller did not assign error to this finding in Tiller's notice of cross appeal. But a minor technical violation of RAP 10.3(g) will not bar review where the nature of the challenge is clear and the challenged ruling is set forth and fully discussed in the appellate brief. Polygon Nw. Co. v. Am. Nat'l Fire Ins. Co., 143 Wn. App. 753, 774, 189 P.3d 777 (2008).

gravel road to access their respective properties. Id. at 41. They did so with mutual awareness and without incident until a dispute arose in 2008. Id. A survey later revealed that most of the gravel road was on the Clarks' property, and the Gamboas sued to establish their right to use the road. Id. The trial court in Gamboa applied a presumption that the Gamboas' use was adverse and ruled in favor of the Gamboas. Id. at 42. Division Three of this court reversed, concluding that the trial court should have applied a presumption that the use was permissive. Id.

The Supreme Court accepted review to clarify when an initial presumption of permissive use should be applied in prescriptive easement cases. Id. at 45 (observing that there was a split in the Court of Appeals on this issue). The court observed that in Drake v. Smersh, 122 Wn. App. 147, 89 P.3d 726 (2004), Division One had strictly limited the presumption of permissive use to vacant and unenclosed land cases—whereas in enclosed and developed land cases, courts could *infer* permission, but *only* if the record supported a reasonable inference of permissive use. Gamboa, 183 Wn.2d at 45; Drake, 122 Wn. App. at 154.

The Supreme Court confirmed that in the context of prescriptive easements, an initial presumption of permissive use *does* apply in enclosed and developed land cases when there is a "reasonable inference of neighborly sufferance or acquiescence." Gamboa, 183 Wn.2d at 50-51. The court cited the following example of a neighborly accommodation: "'persons travel[ing] the private road of a neighbor in conjunction with such neighbor and other persons, nothing further appearing.'" Id. at 51 (alteration in original) (internal quotation

11

marks omitted) (quoting Roediger v. Cullen, 26 Wn.2d 690, 711, 175 P.2d 669 (1946)). The Supreme Court concluded that a presumption of permissive use applied under the facts of Gamboa, where, just as in the foregoing example, "the Gamboas and Clarks [were] neighbors and they used the road for their own purposes in conjunction with each other without incident." Id.

Here, substantial evidence in the record supports the trial court's findings that the owners of the Tiller lot used Lakeview Street to access the Tiller lot, that the lot owners in the plat also used Lakeview Street, and that these uses occurred with mutual knowledge and without discussion. In short, like the Gamboas and the Clarks, Tiller and Tiller's neighbors in the plat—as well as their respective predecessors—all used Lakeview Street for their own purposes and in conjunction with each other without incident until the instant dispute arose. Accordingly, the trial court properly applied a presumption of permissive use under Gamboa.

Tiller relies heavily on Drake and makes no attempt to distinguish Gamboa in their briefing. As discussed, Gamboa, not Drake, controls. In Drake, the court analyzed adverse use in developed land cases and stated a court should infer permissive use only when there was evidence in the record supporting a reasonable inference that the use *was permitted*. Drake, 122 Wn. App. at 154 ("We now consider whether there is any evidence in this record supporting a reasonable inference *of permissive use*. We conclude there is no basis on which a court could reasonably infer that [the claimant's] use *was permitted* by neighborly sufferance or acquiescence.") (emphasis added). But in the absence

of such facts, neither an inference nor a presumption of permissive use would apply. Because Drake was a developed land case, we declined to infer permissive use, observing that permission was neither requested nor received and that the record showed *no* relationship between the claimant and the true owner. Id. at 154. We contrasted cases where courts had inferred permissive use based on a close, friendly, or family relationship. Id. at 154-55 n.21.

Here, the trial court made an express finding that "the owners along Lakeview Street were friendly, neighborly, and some were fairly close-knit." This finding is supported by substantial evidence. We agree with the trial court's observation that "[t]he existence of friendship, however close, does not in and of itself conclusively establish acquiescence." But it does support a reasonable inference of neighborly sufferance or acquiescence, in turn supporting the trial court's application of a presumption of permissive use under Gamboa.

Furthermore, under Gamboa, the fact that no permission was requested or received does not preclude applying a presumption of permissive use. Indeed, in Gamboa, as here, each party was aware of the other's use of the disputed roadway, no one objected until a dispute arose, and the true owners gave neither express nor implied permission to use the roadway. Nonetheless, the Supreme Court inferred neighborly sufferance or acquiescence, explaining that "[w]hat constitutes a reasonable inference of neighborly sufferance or acquiescence is a fairly low bar." Gamboa, 183 Wn.2d at 51. The Supreme Court also explained the policy considerations favoring a presumption of permissive use:

> The law should, and does[,] encourage acts of
> neighborly courtesy; a landowner *who quietly*

13

> *acquiesces* in the use of a path, or road, across his uncultivated land, resulting in no injury to him, but in great convenience to his neighbor, ought not to be held to have thereby lost his rights. It is only when the use of the path or road is clearly adverse to the owner of the land, and not an enjoyment of neighborly courtesy, that the landowner is called upon to go to law to protect his rights.

> Applying a presumption of permissive use incentivizes landowners to allow neighbors to use their roads for the neighbors' convenience. We do not want to require a landowner "to adopt a dog-in-the-manger attitude in order to protect his title to his property." Not applying a presumption of permissive use in these circumstances punishes a courteous neighbor by taking away his or her property right.

Id. at 48-49 (alteration in original) (citations omitted) (internal quotation marks omitted) (quoting Roediger, 26 Wn.2d at 690-709; State ex rel. Shorett v. Blue Ridge Club, Inc., 22 Wn.2d 487, 495-96, 156 P.2d 667 (1945)).[3]

Tiller also argues that there could not have been any neighborly accommodation because there is evidence suggesting that a residence had been established on the cabin lot by 1949, before lots 9 and 10 were developed. Even assuming this were true,[4] it is undisputed that several lots (including lots 9 and 10) in the plat were sold before 1949. Nothing in Gamboa suggests that the first owners of those lots must in fact have completed construction of their residences in the plat for a presumption of permissive use to arise. See Gamboa, 183 Wn.2d at 51 ("What constitutes a reasonable inference of neighborly sufferance

---

[3] A "dog in the manger" describes a person who spitefully stops other people from using something that he or she has no use for.

[4] The trial court made no express finding that a residence was established on the cabin lot before lots 9 and 10 were developed. Furthermore, Tiller's arguments are based in large part on information from the Whatcom County Assessor's records, and testimony in the record indicates that those records were not always reliable.

14

or acquiescence is a fairly low bar."). Furthermore, one witness testified that the Hawleys, who purchased lots 2 and 3 of the plat in June 1945 (and therefore would also have been neighbors of the then-owner of the cabin lot, as well as two-tenth undivided owners of the street parcel), had one of the first houses in the area. That witness also testified that the residents in and around the plat, including the owner of the cabin lot, were friendly with one another even then. Tiller's argument against applying the presumption of permissive use is not persuasive.

(B) The trial court erred in concluding that the presumption was rebutted

Once a presumption of permissive use is established, it can be defeated "'when the facts and circumstances are such as to show that the user was adverse and hostile to the rights of the owner, or that the owner has indicated by some act his admission that the claimant has a right of easement.'" Gamboa, 183 Wn.2d at 44-45 (quoting Nw. Cities, 13 Wn.2d at 87). "For a claimant to show that land use is 'adverse and hostile to the rights of the owner' in this context, the claimant must put forth evidence that he or she interfered with the owner's use of the land in some manner." Id. at 52.

Gamboa did not elaborate on the meaning of "interfered" in this context but provides guidance by citing Northwest Cities. In Northwest Cities, there was evidence that the claimant's predecessor had, without permission from the owner, installed a roadway across a portion of the owner's property that was previously used as an artificial pond. Nw. Cities, 13 Wn.2d at 79. The claimant's predecessor had also hauled in cinders to make the roadway passable for trucks,

15

improved the roadway, and made repairs to it from year to year. Id. at 79, 90-91. Additionally, when the last two owners of the servient estate had conveyed the property, they expressly excluded from the conveyance "'rights of way for roads.'" Id. at 91. And when the claimant's access via the roadway was to be affected by the installation of a fence, the owner of the servient estate notified the claimant and added that an access would be left open for the claimant. Id. at 80-81. Under those facts, our Supreme Court concluded that adversity had been established. Id. at 91.

The Gamboa court also discussed Roediger. In that case, a group of claimants sought a prescriptive easement to use a beachfront footpath on Vashon Island that they had used for around 30 years. Roediger, 26 Wn.2d at 691, 697-98. No users of the path had ever asked the lot owners for permission to cross their lots. Id. at 697. After concluding that a presumption of permissive use applied, the court explained what proof was necessary to rebut the presumption: "'[N]o adverse user can arise until a distinct and positive assertion of a right hostile to the owner, and brought home to him, can transform a subordinate and friendly holding into one of an opposite nature.'" Id. at 714 (internal quotation marks omitted) (quoting Schulenbarger v. Johnstone, 64 Wash. 202, 206, 116 P. 843 (1911)). Then, finding that there was "no evidence to the effect that any [user] ever made a positive assertion to the defendants or to any other lot owner that he claimed to use the path as of right" until certain lot owners posted a notice that the path would be closed, the court concluded that no adverse use was established. Id.

16

Here, as in <u>Roediger</u>, there was no finding that Tiller or any of Tiller's predecessors ever made a positive assertion to the owners within the plat that they claimed to use Lakeview Street as a matter of right. Additionally, the trial court made no finding that Tiller interfered with the true owners' use of the street parcel, which, unlike the disputed property in <u>Northwest Cities</u>, was expressly dedicated solely for use as a road. Indeed, a number of witnesses who once lived in the plat testified that no one who owned the Tiller lot ever interfered with others' use of Lakeview Street, and the parties ultimately stipulated at trial that none of the owners of the Tiller lot or the cabin lot ever blocked or interfered with anyone else's use of Lakeview Street. Furthermore, the trial court's findings point to no act by the owners within the plat that rises to an admission that Tiller or Tiller's predecessors had a right of easement.

Nevertheless, the trial court concluded that Tiller established the element of adversity. The trial court arrived at this conclusion based on finding that (a) the owners of the plat, as a group and individually, subjectively believed that the use of Lakeview Street by those who owned the cabin lot and the Tiller lot was a matter of right; (b) there was no evidence of a concerted effort by the owners within the plat to restrict others from using Lakeview Street; (c) Tiller intended to continue to use Lakeview Street following construction of the Tiller residence, as evidenced by a 2006 entry in a Whatcom County permit application document, stating that "the site has an existing access via easement (Lakeview St)," and by Tiller's construction of a garage on the upper part of the property without installing access to the lower part of the Tiller lot; and (d) termination of access

via Lakeview Street would "de facto" terminate the cabin lot easement, which the trial court concluded would be unfair to the owner of the cabin lot.

Although the trial court's findings are supported by substantial evidence, none of the court's findings establish an act by the owners of the plat that would amount to an admission that Tiller or Tiller's predecessors had a right of easement, and none constitute "'a distinct and positive assertion'" by any owner of the Tiller lot of "'a right hostile to the owner, and brought home to him.'" Roediger, 26 Wn.2d at 714 (internal quotation marks omitted) (quoting Schulenbarger, 64 Wash. at 206). First, the subjective belief of owners within the plat regarding the right to use Lakeview Street is not relevant to the inquiry of adversity. Dunbar, 95 Wn.2d at 27 ("[A]dversity is to be measured by an objective standard; that is, *by the objectively observable acts of the user and the rightful owner.*") (emphasis added). Also irrelevant to that inquiry is the fact that the owners within the plat did not make a concerted effort to restrict others from using Lakeview Street, because one who "'quietly acquiesces'" in the use of a road "'ought not to be held to have thereby lost his rights.'" Gamboa, 183 Wn.2d at 48 (internal quotation marks omitted) (quoting Roediger, 26 Wn.2d at 709). Tiller's subjective intent to use Lakeview Street also does not determine whether the presumption has been rebutted. Dunbar, 95 Wn.2d at 27. Even if the 2006 entry in the Whatcom County permit records or Tiller's garage construction (which the record indicates began in May 2007) were relevant, the 10-year prescriptive period would not have elapsed between either of those occurrences and July 2014, when Tiller filed this lawsuit. Finally, unfairness to a third party

18

(here, the owner of the cabin lot) is not part of the inquiry under <u>Gamboa</u>.

The trial court also found that the creation of the Tiller lot and the cabin lot, and the recordation of the cabin lot easement, "put all on notice that there could be a right of access for property owners to the east." This finding, which charges the owners of lots within the plat with constructive notice of the creation of the cabin lot and recordation of the cabin lot easement, is actually a conclusion of law, and we review it as such. <u>See</u> BLACK'S LAW DICTIONARY 1227 (10th ed. 2014) (defining "constructive notice" as "[n]otice arising *by presumption of law* from the existence of facts and circumstances that a party had a duty to take notice of, such as registered deed or a pending lawsuit; notice *presumed by law* to have been acquired by a person and thus imputed to that person") (emphasis added); <u>Willener v. Sweeting</u>, 107 Wn.2d 388, 394, 730 P.2d 45 (1986) ("A conclusion of law erroneously described as a finding of fact is reviewed as a conclusion of law.").

Because the owners within the plat had no duty to search for recorded documents outside their own respective chains of title, the trial court erred by charging Lackey and Lackey's predecessors with constructive knowledge of the creation of the Tiller lot and the cabin lot, and recordation of the cabin lot easement. <u>Koch v. Swanson</u>, 4 Wn. App. 456, 459, 481 P.2d 915 (1971) ("[O]ne searching the index has a right to rely upon what the index and recorded document discloses and is not bound to search the record outside the chain of title of the property presently being conveyed."). Furthermore, creation of the Tiller lot and the cabin lot, and recordation of the cabin lot easement, suggest, at

19

most, a subjective intent to use Lakeview Street for access to the Tiller lot and the cabin lot. But, as discussed, the claimant's subjective intent is not relevant. These activities do not rebut the presumption of permissive use.

Tiller, in an attempt to further justify the trial court's conclusion about adversity, argues that the fact that there were two lawsuits involving the cabin lot easement—one in 1959 and another in 2007—should favor rebutting the presumption. Tiller cites Shumate v. Ashley, 46 Wn.2d 156, 278 P.2d 787 (1955), in support of this proposition. But Shumate was a probate case, where the issue was whether an estate creditor properly followed the procedures for filing a claim. Id. at 157. The court mentioned in passing that the clerk's file is the court record and is notice to the world of what it contains, but notice was not the issue in that case. Id. Tiller's argument is not persuasive.

Tiller also argues that by contributing labor and materials to improve Lakeview Street, Tiller treated Lakeview Street "as an owner would," and that adversity should be established on this basis. Tiller relies on Kunkel v. Fisher, 106 Wn. App. 599, 23 P.3d 1128 (2001), for the proposition that the test for adversity is whether the claimant uses the property as the true owner would. This reliance is misplaced. The court in Kunkel did state that, in the law of prescriptive easements, using the disputed property as the true owner would is part of the test for adversity, just as it is in the law of adverse possession. Id. at 602. However, the court went on to explain that there are differences in how the two doctrines originated and that these differences "have resulted in a single but important difference in how they are applied:"

20

> In a claim for a prescriptive easement there is a presumption that the servient property was used with the permission of, and in subordination to, the title of the true owner. If the use is initially permissive, it may ripen into a prescriptive easement *only if the user makes a distinct, positive assertion of a right adverse to the property owner.*

Id. at 603-04 (emphasis added) (footnote omitted). In other words, Kunkel confirms that where, as here, a presumption of permissive use applies in the context of prescriptive easements, a showing that the claimant used the disputed property as a true owner would is not enough to rebut that presumption.

Tiller's attempt to distinguish Granston v. Callahan, 52 Wn. App. 288, 759 P.2d 462 (1988), where the court concluded that the claimant's use was permissive, is similarly unpersuasive. In Granston, the court observed that when a claimant's use is permissive at its inception, it follows that the claimant will use the disputed property as a true owner. Id. at 293. Accordingly, the use-as-a-true-owner test "appear[s] to have very little practical application in cases . . . where the commencement of the use was clearly permissive." Id. Thus, the court concluded that "a use which is initially permissive cannot ripen into a prescriptive right unless the claimant makes a distinct and positive assertion of a right hostile to the owner." Id. at 294. Granston, like Kunkel, simply confirms that when permissive use is implied, or, under Gamboa, presumed, the level of proof required for the claimant to establish adversity is heightened and requires more than a showing that the claimant used the disputed property as his own.

Tiller also attempts to distinguish Imrie v. Kelley, 160 Wn. App. 1, 250 P.3d 1045 (2010). Tiller asserts that the Imrie opinion, in which the court concluded the use was permissive, "contains no mention of neighborly

21

accommodation" and that there was no indication in Imrie that the road over the servient property provided the only access to the dominant property. But the Imrie court did in fact observe that a portion of the claimant's property was accessible only through the true owner's property and nevertheless concluded that the trial court's findings supported "an inference of neighborly accommodation." Id. Tiller misrepresents Imrie.

Finally, Tiller argues that David Tiller's contribution of labor and materials to a shared project involving Lakeview Street further rebuts the presumption of permissive use. However, the Washington cases on which Tiller relies only indicate that maintenance is likely necessary, but not sufficient, to rebut the presumption. In Anderson v. Hudak, 80 Wn. App. 398, 907 P.2d 305 (1995), the issue was whether the claimant had adversely possessed a row of trees, and after finding that the claimant had produced no evidence that she even sporadically maintained and cultivated the disputed trees, the court remarked that a person claiming adverse possession "must and would take some steps to care for the trees." Id. at 404. And as discussed, Drake is inapposite because there was no presumption applied in that case. Therefore, there was no presumption to rebut. Finally, even in Gamboa, where the presumption of permissive use did apply, the court concluded that the presumption had not been rebutted by the Gamboas' maintenance because "[t]he Gamboas' occasional blading of the road did not interfere with the Clarks' use of the road in any manner." Gamboa, 183 Wn.2d at 40, 52. Here, as in Gamboa, there is no evidence that David Tiller's contribution of labor and materials to the shared

project interfered with Lackey's use of Lakeview Street.

The trial court's findings of fact do not support a legal conclusion that Tiller rebutted the presumption of permissive use. Therefore, we reverse the trial court's conclusion that Tiller established adverse use and that Tiller established a prescriptive easement. And because Tiller has not established adverse use, we need not consider whether adverse use occurred continuously for the requisite 10-year period.[5]

## III. Easement Implied by Necessity

In Tiller's cross appeal, Tiller argues that the trial court erred by concluding that no implied easement in favor of the Tiller lot arose by necessity. We agree.

Preliminarily, Lackey claims that whether an implied easement arose is a finding of fact. However, implied easements "come[ ] into existence *by implication of law* from the facts." Adams v. Cullen, 44 Wn.2d 502, 504, 268 P.2d 451 (1954) (emphasis added). Accordingly, we review the trial court's findings of fact to determine whether they were supported by substantial evidence, and we then review whether those findings support the trial court's legal conclusion that no easement should be implied. Hegwine, 132 Wn. App. at 555.

An implied easement "is an expression of a public policy that will not permit property to be landlocked and rendered useless." Hellberg v. Coffin

---

[5] For the same reason, we also need not consider Lackey's arguments that the period of adverse use was interrupted either by Steven Lackey's actions in early July 2014 or by Tiller's predecessors' concurrent ownership of both the Tiller lot and an undivided one-tenth interest in the street parcel.

Sheep Co., 66 Wn.2d 664, 666, 404 P.2d 770 (1965). In furtherance of this policy, an easement may be implied

> "(1) when there has been unity of title and subsequent separation; (2) when there has been an apparent and continuous quasi easement existing for the benefit of one part of the estate to the detriment of the other during the unity of title; and (3) when there is a certain degree of necessity . . . that the quasi easement exist after severance."

Id. at 668 (quoting Adams, 44 Wn.2d at 505).[6] The first of the foregoing elements—unity of title and subsequent separation, i.e., that a common owner sells part of his land and retains part, usually an adjoining parcel—"'is an absolute requirement.'" Hellberg, 66 Wn.2d at 668 (quoting Adams, 44 Wn.2d at 505). The second and third are "'aids to construction in determining the cardinal consideration—the presumed intention of the parties as disclosed by the extent and character of the user, the nature of the property, and the relation of the separated parts to each other.'" Id. (quoting Adams, 44 Wn.2d at 505). "'[T]he presence or absence of either or both of these requirements is not necessarily conclusive.'" Id. (quoting Adams, 44 Wn.2d at 505). Accordingly, an easement may be implied on the basis of unity, severance, and necessity alone if the subject land cannot be used "'without disproportionate effort or expense.'" Adams, 44 Wn.2d at 509 (quoting RESTATEMENT OF PROPERTY: SERVITUDES § 476 cmt. g at 2983 (AM. LAW INST. 1944)).

The necessity for the easement must exist at the moment of severance.

---

[6] A "quasi easement" is "one which may arise between two pieces of land owned by the same person, when the enjoyment by one piece of a right in the other would be a legal easement, were the pieces owned by different persons." Adams, 44 Wn.2d at 504.

Bailey v. Hennessey, 112 Wash. 45, 48-49, 191 P. 863 (1920); Granite Beach Holdings, LLC v. Dep't of Nat. Res., 103 Wn. App. 186, 190, 11 P.3d 847 (2000); see also WILLIAM B. STOEBUCK & DALE A. WHITMAN, THE LAW OF PROPERTY § 8.5, at 449 (3d ed. 2000) ("Necessity for the easement must exist at the moment of severance; a necessity arising later will have no effect.").

Here, the trial court first analyzed whether an easement should be implied based on the necessity existing when the Provanches created the cabin lot in 1949 and when they first sold the Tiller lot in 1953. The trial court concluded that access via the street parcel to these otherwise landlocked lots was necessary in 1949 and 1953. But the trial court concluded that the unity-and-severance element was not satisfied at those times because the Provanches had already severed their interest in the plat, including the street parcel, by the time they created the cabin lot in 1949. In other words, by 1949, there was no unity of title between the street parcel and the Provanches' remaining property to the east of the plat. Accordingly, the trial court concluded, no easement burdening the street parcel could have arisen by implication as of 1949 or 1953.

Although this analysis would be correct if 1949 and 1953 were the relevant foci for the inquiry, they are not. Instead, the proper focus for the implied easement analysis is June 27, 1947. This is the date on which the Provanches sold the last lot in the plat and thereby severed the unity of title between the plat, including the street parcel, and their remaining property to the east of the plat.[7]

---

[7] The parties do not dispute that this was the date of severance as between the plat and the Provanches' remaining property. Accordingly, we need

To this end, the trial court did conduct an implied easement analysis as of June 27, 1947, and acknowledged that unity of title as between the plat and the Provanches' remaining property was severed on that date. But the trial court concluded that the necessity element of the implied easement analysis was not satisfied at that time because the Tiller lot and the cabin lot did not exist as independent or separate lots within the Provanches' remaining property to the east of the plat. In other words, although there was unity followed by a subsequent severance between the plat (including the street parcel) and the Provanches' remaining property on June 27, 1947, the trial court concluded that no easement could be implied, *solely* because the land that now comprises the Tiller lot and the cabin lot was still part of a larger parcel of property owned by the Provanches at that time.

Lackey cites no Washington authority to support the trial court's conclusion that an easement may not be implied for ingress and egress to a portion of a larger parcel of property to which some access exists after severance. But in Evich v. Kovacevich, 33 Wn.2d 151, 204 P.2d 839 (1949), the Washington Supreme Court decided that an easement may be implied so long as there is "a *reasonable necessity* for the easement in order to secure and maintain the quiet enjoyment of the dominant estate." Id. at 157 (emphasis added). And in the analogous context of private condemnation actions, where the court must analyze whether a private way of necessity is necessary for the "proper use and

---

not consider whether severance actually occurred when the Provanches sold the first lot in the plat (such that the Provanches no longer owned the entire interest in the street parcel).

enjoyment" of the condemnor's land, RCW 8.24.010, we have observed that "access to one portion of a condemnor's property does not necessarily preclude his obtaining a vehicular access to other parts of his property not reasonably available without encroaching upon his neighbor's property." Beeson v. Phillips, 41 Wn. App. 183, 188, 702 P.2d 1244 (1985) (citing State ex. rel. Huntoon v. Superior Ct., 145 Wash. 307, 260 P. 527 (1927)).

Furthermore, the Restatement (Third) of Property states, in pertinent part:

> To support implication of a servitude [by necessity], the rights claimed must be necessary to the *reasonable enjoyment of the property.* "Necessary" rights are not limited to those essential to enjoyment of the property, but include those which are *reasonably required to make effective use of the property.* If the property cannot otherwise be used without disproportionate effort or expense, the rights are necessary within the meaning of this section. *Reasonable enjoyment of the property means use of all the normally useable parts of the property for uses that would normally be made of that type of property.*

RESTATEMENT (THIRD) OF PROPERTY § 2.15 cmt. d (2000) (emphasis added).

Consistent with the Restatement (Third) of Property, Professors William Stoebuck and Dale Whitman observed most courts do not require strict necessity to imply an easement:

> If the claimant has free access to some part of his land, he cannot make out a way of necessity to another part just because it would be more convenient. *However, while some courts may insist on the land's being landlocked, most recognize a degree of flexibility.* Sometimes it is said the claimant is entitled to sufficient access to make "effective use" of his land.

STOEBUCK & WHITMAN § 8.5, at 448 (emphasis added) (footnote omitted).

We conclude the fact that the Tiller lot did not exist as a separate and distinct parcel at the time the Provanches severed the plat from their remaining

27

property does not preclude the implication of an easement burdening the plat, and more specifically the street parcel, in favor of the Tiller lot.

Next we consider whether the trial court's findings support the implication of an easement. Specifically, we consider whether at the time of severance, there was a reasonable necessity for an easement burdening the street parcel to secure and maintain the quiet enjoyment of the portion of the Provanches' property now comprising the Tiller lot and the cabin lot. We are cognizant that where, as here, the claim is that an implied easement was *reserved* by the grantor (here, the Provanches) in favor of the property retained (as opposed to *granted* by the grantor in favor of the property sold), a higher degree of necessity is required to imply an easement if no prior use can be shown. Adams, 44 Wn.2d at 509. Additionally, although policy considerations favor implying easements so that property will not be rendered landlocked or useless, Hellberg, 66 Wn.2d at 666, "'[e]asements by implication are not favored by the courts because they are in derogation of the rule that written instruments speak for themselves.'" MacMeekin v. Low Income Hous. Inst., Inc., 111 Wn. App. 188, 196, 45 P.3d 570 (2002) (quoting 1 WASH. STATE BAR ASS'N, WASHINGTON REAL PROPERTY DESKBOOK § 10.3(3)(b) (3d ed. 1997)). The "cardinal consideration"—indeed, the "prime factor"—in analyzing whether an easement should be implied is "the presumed intention of the parties." Evich, 33 Wn.2d at 157; Rogers v. Cation, 9 Wn.2d 369, 379, 115 P.2d 702 (1941).

We conclude that under the unique circumstances presented here, an implied easement should be granted in Tiller's favor. First, substantial evidence

28

in the record supports the trial court's finding that before 1976 (when the then-owners of the Tiller lot and the cabin lot acquired the abandoned right-of-way between their parcels and Northshore Road), the property comprising the Tiller lot and the cabin lot was landlocked by the plat to the west, the railroad to the north, a stream and ravine to the east, and Lake Whatcom to the south. Specifically, the trial court found

> there was necessity for access across Lakeview Street to the [Tiller lot], and to the cabin lot, and that existed because of the fact that, with the cabin lot creation, it was fully landlocked. In fact, the [Tiller] lot now owned by the [Tillers] was also at that point in time probably landlocked as well. Prior to 1976, access to Northshore Road was not available and not likely to be granted due to the railroad which was in active use. There was no access to the east. The stream and its ravine on the east side of the cabin lot prevented it. There was no evidence of access from the east at any time.

The trial court also noted, in unchallenged findings, that the Tiller lot "may have also been technically landlocked if there was no right to access it via Lakeview Street" and that although the creation of the cabin lot easement did not itself convey any right to use Lakeview Street, "without such use the easement is meaningless. It would be an 'easement to nowhere.'" Furthermore, and significantly, the Provanches could have terminated the street parcel at the western boundary of lot 10 had they intended the street parcel to serve only the plat. But they chose to extend the street parcel, which, again, was reserved for use solely for street purposes, all the way *across* the northern boundary of lot 10 to its boundary with what is now the Tiller lot. Although the trial court concluded that this choice by the Provanches did not create a presumption that the Provanches intended to create separate and distinct lots from the portion of their

remaining property now comprising the Tiller lot and the cabin lot, this choice—together with the fact that that portion of their property was landlocked in 1947—does indicate that the Provanches intended to reserve an access to that portion of their remaining property via the street parcel.

The facts of this case are closely analogous to Fossum Orchards v. Pugsley, 77 Wn. App. 447, 892 P.2d 1095 (1995). In Fossum Orchards, Delva and Ora Mae Harris originally owned a five acre parcel in Yakima County. Id. In 1978, the Harrises divided the property into three lots, and in 1983, the Harrises installed a pipe the entire length of the property to deliver water from a weir located on the southernmost lot. Id. at 449-50. The southernmost lot (lot 1) was sold by the Harrises to George Arthur in 1985. Id. at 450. In 1986, the Harrises sold lot 2, the lot immediately north of lot 1, to Daniel Pugsley Jr. Id. And in 1988, the Harrises sold the remaining lot, lot 3, to Gregory Williams, who later conveyed it to Fossum Orchards. Id. At that time, there was no evidence that the pipe installed in 1983 had ever been used to irrigate lot 3, and Pugsley Jr. had previously disconnected it while repairing the portion of the pipe on lot 2. Id. After Pugsley Jr. refused to allow Fossum Orchards to reconnect to the pipe, Fossum Orchards sued for an implied easement by necessity. Id. at 451.

In Fossum Orchards, we affirmed the trial court's conclusion that an easement by necessity would be implied. Id. at 449. In doing so, we acknowledged that there was no evidence at the time of severance that the pipe was ever used to deliver water to lot 3. See id. at 451. However, the pipe itself was in existence at that time, no alternative source of water was reasonably

30

available, and "[a]lthough prior use is a circumstance contributing to the implication of an easement, if the land cannot be used without the easement without disproportionate expense, an easement may be implied on the basis of necessity alone." Id. at 451-52.

Here, the street parcel is analogous to the pipe in Fossum Orchards, and Lakeview Street is analogous to water flowing within it. Although Lakeview Street may not yet have been installed within the street parcel at the time of severance, neither was there evidence that the pipe in Fossum Orchards had ever been used. Furthermore, like the pipe in Fossum Orchards, the street parcel was in existence at the time of severance: It had been dedicated as a separate parcel specifically for street purposes, and its location had been fixed on the recorded plat. And again, the street parcel extends completely across the northern boundary of lot 10, when it could have ended *at* lot 10 had lot 10 been its intended terminus.

Lackey relies on McPhaden v. Scott, 95 Wn. App. 431, 975 P.2d 1033 (1999), to argue that the trial court correctly declined to imply an easement. In McPhaden, we affirmed the trial court's directed verdict that no implied easement existed because the claimant had failed to establish prior use or necessity. Id. at 439. However, in McPhaden, the road at issue—although recorded at the time of severance—was an easement road, and the claimant's own testimony that a driveway could be installed established that use of the disputed road was not reasonably necessary to access his property. Id. at 433, 438-39.

Here, unlike in McPhaden, the road at issue is not just an easement road

31

over someone's parcel, but a road installed within a separate and distinct parcel dedicated solely for use as a road. Furthermore, the trial court's unchallenged findings establish that, at the time of severance, use of the easement would have been reasonably necessary to access a physically landlocked portion of the remaining Provanche property east of the plat.

In sum, the Provanches reserved the cabin lot easement only a few years after recording the plat. The Provanches also extended the street parcel—which, again, was dedicated specifically for street purposes—completely *across* the northern boundary of lot 10. Furthermore, the portion of the Provanches' property just east of the plat was landlocked. These unique circumstances together support a conclusion that the Provanches intended to reserve to themselves an easement for access to the landlocked portion of their remaining property at the time they severed their interest in the plat. We conclude that the elements of an implied easement have been satisfied.

In Tiller's cross appeal, Tiller also challenges finding of fact 29. Finding of fact 29 includes a number of observations regarding the present-day necessity of an access to the Tiller lot via Lakeview Street. Tiller challenges only the court's observation that it "need not decide if there is a requirement of direct access to the house instead of the garage building" and that "[m]ost likely, the current driveway would be deemed adequate under the law if the Court were addressing the issue of necessity." The trial court then states in finding of fact 30 that because there is no legal basis for an implied easement by necessity, "any evidence or legal theories regarding the physical realities on the [Tiller] lot . . . are

essentially irrelevant." We agree with this finding inasmuch as it states that necessity must be evaluated at the time of severance. But we disagree that present-day conditions on the Tiller lot are irrelevant. The findings regarding present-day physical realities of the Tiller lot are relevant to the extent that these same realities existed at the time of severance, and they are also relevant in determining the scope of the easement that will be implied. Specifically, although the scope of an implied easement is "initially defined by the necessity . . . existing [at the time of severance], . . . similarly to a granted easement of general access, its permitted scope is capable of gradual change to keep pace with reasonable changes in uses of the dominant tenement." STOEBUCK & WHITMAN, § 8.5, at 449. Here, in an unchallenged finding, the trial court observed that Tiller is still

> limited by topography, by the need to honor the [cabin lot] easement in favor of the cabin lot, by the placement of utilities such as transformer, gas line, and fire hydrant. Therefore, . . . the need is a greater one than just one of convenience, as there are significant physical and cost restraints on building a direct driveway from Northshore Road to the Tiller house site.

This finding confirms that necessity still exists, even though the scope of the implied easement may have changed over time.

To that end, because the trial court's award of an easement to Tiller takes into account changes in the physical realities of the Tiller lot since 1947, we affirm that award, including those portions of the trial court's judgment specifying the width and location thereof and the restrictions placed by the trial court on use of Lakeview Street by Tiller and the owners of lots 9 and 10.

We also affirm the trial court's award of $1,340 in costs to Tiller because although Lackey assigned error to this award, Lackey did not provide specific

33

argument. <u>Holland</u>, 90 Wn. App. at 538 ("Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration.") (citing <u>Johnson</u>, 119 Wn.2d at 171).

## CONCLUSION

We hold that the court had subject matter jurisdiction and that the trial court erred by concluding the requirements of a prescriptive easement were satisfied but the requirements of an implied easement by necessity were not. We conclude the trial court's findings support recognizing an implied easement by necessity. We remand to the trial court for entry of revised conclusions of law consistent with this opinion and a revised judgment that specifies the easement is an implied easement rather than a prescriptive easement.

WE CONCUR:

FILED
COURT OF APPEALS DIV 1
STATE OF WASHINGTON
2018 DEC 10 AM 9: 04